DAY MINES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3171–62. Filed May 5, 1964.

**338**

*Lincoln Arnold* and *Scott B. Lukins*, for the petitioner.
*Wilford H. Payne*, for the respondent.

Dawson, *Judge:* Respondent determined deficiencies in petitioner's income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1957 | $32,047.55 |
| 1958 | 336,841.40 |
| 1959 | 533,600.39 |

All issues raised by the pleadings have been settled by agreement of the parties except for the amount of cost depletion allowable to the petitioner during 1957 and 1958 on account of minerals sold in those taxable years from the Hercules mine. This depends upon whether the petitioner's elections to aggregate a number of its operating mineral interests—called the Burke aggregation—are valid (1) for the taxable year 1957 under the provisions of section 614(b), I.R.C. 1954, and (2) for the taxable year 1958 under the provisions of section 614(c), I.R.C. 1954, as amended by the Technical Amendments Act of 1958.

In his notice of deficiency the respondent asserted that the Hercules mine at the beginning of 1957 had a depletable tax basis of zero. Since the parties have stipulated that the adjusted depletable tax basis of the Hercules mine on January 1, 1957, was $3,430,174, no deficiency exists for 1957 or 1958, even if the Burke aggregations for such years were invalid. However, the validity of the Burke aggregations for 1957 and 1958 is still in controversy because of the deficiency asserted for the year 1959. While no minerals from the Burke aggregation were sold during 1959, there will be no deficiency for 1959 if the Burke aggregations are valid since the cost depletion allowable for 1957 and 1958 on an aggregated basis will produce net operating loss carryovers from those years sufficient to offset all income for 1959.

### FINDINGS OF FACT

Many of the facts and exhibits have been stipulated by the parties and are incorporated herein by this reference.

Day Mines, Inc. (hereinafter called petitioner), is a corporation created on October 1, 1947, through the statutory consolidation under

the laws of the State of Idaho of 12 other companies. Since its incorporation the petitioner's principal place of business has been in Wallace, Idaho. For the taxable years 1957, 1958, and 1959 the petitioner filed its Federal corporation income tax returns and amended returns with the district director of internal revenue, Boise, Idaho.

Each of the 12 corporations which participated in the statutory consolidation also had its principal office and place of business in the Day Building, Wallace, Idaho. All of the consolidated companies owned patented, and in some cases unpatented, mining claims near Wallace, with many of the claims held by the different companies being contiguous to each other. With minor exceptions, all of the mineral properties owned by the consolidated companies were within a radius of 12 miles from the Hercules mine, which is approximately 7 miles from Wallace.

Henry L. Day has been the president of the petitioner since its incorporation in 1947. At the time of the consolidation he was a director of each of the 12 companies which entered into the consolidation, and he held the position of president and manager of each of the 12 companies except Dayrock Mining Co., where he held the office of vice president and manager.

The Hercules mine, located at Burke, Idaho, was a producing mine on March 1, 1913. At that time it was owned and operated under the laws of Idaho as a mining partnership controlled by the Day, Rothrock, and Paulsen families. In 1923 the mining partnership was incorporated under the laws of Delaware as the Hercules Mining Co. This corporation owned the Hercules mine at the time of the 1947 consolidation.

In 1925 the Hercules mine was shut down and the mine was allowed to fill with water to the collar at the main shaft of the No. 5 adit level. The underground hoist of the main shaft was left in the mine and kept in condition for possible future use. The Hercules mine was closed because of the removal of all then known commercial ores. Following the 1947 consolidation, petitioner proceeded to unwater the Hercules mine in order to explore the mine at depth. Exploration and development work was conducted from 1947 to January 1, 1957, when the Hercules mine went back into production. During the years 1952 through 1958 a portion of the cost of exploration and development work was defrayed by the U.S. Government under a Defense Mineral Exploration Administration Contract. Commercial ores were discovered and, after the Hercules mine was dewatered, a total of 21,623,301 pounds of lead was removed therefrom.

The Hercules mine was part of an operating unit which petitioner termed its Wallace Operating Unit. The Wallace Operating Unit included all operating mineral interests owned by petitioner in the

Coeur d'Alene mining district other than petitioner's 25-percent working interest in the Galena mine. That interest constituted a separate operating unit since it was managed and operated by another company. The Coeur d'Alene mining district is an east-west belt about 10 miles wide in a northerly and southerly direction and 30 miles long easterly and westerly, in Shoshone County, Idaho. The Wallace Operating Unit is comprised of mineral rights underlying approximately 14,710 acres of mineral lands located within a radius of 18 miles from Wallace.

Final Treasury regulations with respect to the making and filing of elections under section 614 of the Internal Revenue Code of 1954, as amended by section 37 of the Technical Amendments Act of 1958, were published by the Internal Revenue Service in the Federal Register of January 10, 1961. Thereafter, petitioner, on May 1, 1961, filed with the district director of internal revenue at Boise, its election under section 614(b) to aggregate for the calendar year 1957 some of its mineral interests in its Wallace Operating Unit. (Elections were also made to make other aggregations in other operating units which are not involved in this proceeding.) Under the election for 1957 petitioner elected to form one aggregation within the Wallace Operating Unit, to be known as the Burke aggregation, and to treat each mineral interest not included in the Burke aggregation as a separate property. The election statement for 1957 with respect to the Wallace Operating Unit was accompanied by more than 50 maps and plats and more than 150 pages of supporting schedules. These maps and schedules set forth in detail the location and description of each operating mineral interest which petitioner elected to include in the Burke aggregation.

The operating mineral interests in 42 properties, including the Hercules mine, were included in the 1957 Burke aggregation. The aggregation for 1957 consisted of mining claims and approximately 5,270 acres and included 367 patented mining claims and 16 unpatented mining claims. A mining claim is usually an area of about 20 acres on public domain subject to entry by interested parties who locate a mineral vein or who make discovery and find some mineralization in sufficient quantity to justify proceeding with more effort and time. In order to patent a mining claim it is necessary to expend thereon at least $500 in improvements. A mining claim cannot be patented unless there has been such a discovery of minerals in place as would justify a person of ordinary prudence in the further expenditure of his time and means in an effort to develop a paying mine.

None of the properties included in the Burke aggregation for 1957, other than the Hercules mine, had any known commercial mineral deposits that could qualify as an ore reserve. For the most part the other 41 properties had been explored. Some underground workings

had been conducted by predecessor owners in earlier years, but relatively few of them developed any mineral production. A number of the properties included in the aggregation have substantial tonnages of subores, i.e., ores which cannot be mined at a profit under today's costs and prices. All the mining claims included in the Burke aggregation for 1957 contained minerals in place, although not in commercial quantities.

The total fair market value as of December 31, 1957, of the 42 properties included in the Burke aggregation for the year 1957, based upon the judgment of the corporation's officers, which assumed a willing buyer and a willing seller, with no offers of purchase or attempts to sell to guide them, was $794,500, of which $500,000 was attributed to the Hercules mine and the remaining $294,500 to the other 41 properties. Few sales of such properties are made in the area. Generally any sales of such properties are made through means of a working agreement or venture operation.

On January 1, 1957, the adjusted depletable tax basis of the operating mineral interests included in the Burke aggregation for 1957 was $6,910,556, tabulated as follows:

| Name of property | Acres | Tax basis of surface | Adjusted depletable basis on Jan. 1, 1957 |
|---|---|---|---|
| Ambergris mine | 281 | $2,810 | $19,025 |
| Basin mine | 103 | 1,030 | 8,970 |
| Hercules mine | 137 | 1,370 | 3,430,174 |
| Lincoln mine | 93 | 930 | 59,664 |
| Ratler mine | 48 | 480 | 21,894 |
| Rambler-Mercury mine | 165 | 1,650 | 53,696 |
| Anna-Nellie mine | 33 | 330 | 50,473 |
| Burke group of claims | 12 | 120 | 16,469 |
| Happy Day mine | 115 | 1,150 | 52,470 |
| Laclede mine | 179 | 1,790 | 3,131 |
| Idaho & Eastern mine | 37 | 370 | 29,227 |
| Smuggler & Trade Dollar mines | 75 | 750 | 1,250 |
| Stanley mine | 152 | 1,520 | 93,509 |
| Hummingbird mine | 188 | 1,880 | None |
| Black Jack mine | 130 | 1,300 | 8,766 |
| Puritan mine | 62 | 620 | 2,322 |
| Olympia mine | 188 | 1,880 | 10,120 |
| Hutton mine | -------- | -------- | 3,000 |
| Blaine mine | 190 | 1,900 | 41,540 |
| Treasure Vault mine | 67 | 670 | 36,454 |
| Western Union mine | 220 | 2,200 | 250,000 |
| Roanoke mine | 342 | 3,420 | 56,741 |
| Crystal Lead mine | 181 | 1,810 | 130,584 |
| Aetna mine | 76 | 760 | 6,640 |
| Sonora mine | 160 | 1,600 | 138,138 |
| Andrews mine | 38 | 380 | 2,325 |
| Marsh mine | 49 | 490 | 208,821 |
| Got-em-now mine | 16 | 160 | 47,790 |
| Hecla East Vein mine | 30 | 300 | 154,472 |
| Green Mountain mine | 23 | 230 | 5,770 |
| Gertie mine | 43 | 430 | 111,720 |
| Maher-Hearn mine | 498 | 4,980 | 435,047 |
| Duluth mine | 105 | 1,050 | 38,359 |
| Baldy mine | 36 | 360 | 8,506 |
| East Standard mine | 39 | 390 | 6,759 |
| Imperial mine | 128 | 1,280 | 149,704 |
| Liquidator mine | 211 | 2,110 | 36,275 |
| Copper King mine | 300 | 3,000 | 527,492 |
| East Hecla Group mine | 67 | 670 | 3,330 |
| National Copper mine | 106 | 1,060 | 623,913 |
| General mine | 200 | -------- | 23,581 |
| Missoula Copper mine | 144 | 1,440 | 2,435 |
| Total for 1957 | 5,267 | 50,670 | 6,910,556 |

The cost depletion deduction allowable for 1957 on account of minerals produced and sold from the Hercules mine is 16.2522 percent of the adjusted depletable tax basis of the Burke aggregation as of January 1, 1957, or the sum of $1,123,117.

On September 14, 1961, petitioner filed with the district director of internal revenue at Boise, Idaho, its election under section 614(c) of the Internal Revenue Code of 1954, as amended by the Technical Amendments Act of 1958, to form a Burke aggregation within the Wallace Operating Unit, effective for the calendar year 1958 and subsequent years. Under the section 614(c) election the petitioner elected to form 16 aggregations within the Wallace Operating Unit, but only the Burke aggregation is involved in this proceeding. The Burke aggregation for 1958 included all the operating mineral interests which had been included in the Burke aggregation for the year 1957. It also included the operating mineral interests in 11 additional properties which had not been included in the 1957 Burke aggregation, the most important of which was the Monitor mine. None of the properties included by petitioner in the 1958 Burke aggregation, other than the Hercules and the Monitor mines, contained any known commercial mineral deposits that could qualify as an ore reserve. The 10 properties added to the 1958 Burke aggregation which had no remaining bases or mineral reserves had been the subject of some development work in prior years, but no minerals were found and no production realized.

Petitioner's 1958 election statement included maps and schedules setting forth in detail the location and description of each operating mineral interest which petitioner elected to include in the Burke aggregation for that year. Petitioner did not include in the 1958 Burke aggregation any property which is not a part of the Wallace Operating Unit. In the case of each property included in the 1958 Burke aggregation, the petitioner elected to include every operating mineral interest which it owned in the property. In no instance did the petitioner include in the 1958 Burke aggregation only part of the mineral interest contained in a mine.

The adjusted depletable tax basis of the Burke aggregation for 1958 as of January 1, 1958, amounted to $5,831,682, computed as follows:

| | |
|---|---:|
| Adjusted depletable basis of the Burke aggregation for 1957 as of Jan. 1, 1957 | $6,910,556 |
| Less: Depletion allowable for 1957 | 1,123,117 |
| | 5,787,439 |
| Add: Adjusted depletable basis on Jan. 1, 1958, of the Monitor mine | 44,243 |
| Adjusted depletable basis of the Burke aggregation for 1958 as of Jan. 1, 1958 | 5,831,682 |

The cost depletion deduction allowable for 1958 on account of minerals produced and sold from the Hercules mine is 20.1717 percent of the adjusted depletable tax basis of the Burke aggregation as of January 1, 1958, or the sum of $1,176,349.

Certain geological studies of the Burke-Mullan area in the Coeur d'Alene mining district were made in 1948 with special reference to the properties owned by the petitioner. And in 1954 the petitioner employed geologists to make studies concerning its properties, some of which were later included in the Burke aggregations. Their report showed estimated costs for exploration and development of recommended projects of some $2 million. As a result of the studies made by the geologists in 1948 and 1954, 12 were recommended for exploration and development work. Only three of them were undertaken and all were unsuccessful in finding any ore of minable grade. The plans were placed on a rather low-scale priority by petitioner. However, Henry L. Day, the petitioner's president, expects that most, if not all, of the exploration projects recommended by the geologists will eventually be carried out.

No concentrates were sold from the Burke aggregation in the year 1959.

The Monitor mine was omitted by petitioner from the 1957 election but was included for the year 1958. The inclusion of that property in the 1957 Burke aggregation would have reduced the proportion of cost depletion allowable for that year. The petitioner included the Monitor mine in the 1958 Burke aggregation because it was thought that it would extend the depletion allowance over a longer period of time into the future than would be obtained from the Hercules mine.

Petitioner's elections to aggregate were made in an effort to recover the maximum amount of the expenditures which had been made by petitioner and its predecessor corporations with respect to the subject properties over a period of approximately 60 years. Petitioner believed that the only way it could obtain that recovery was through depletion and it sought to do so by using the aggregation method.

Petitioner's gross receipts for the years 1957 through 1959 were as follows:

|  | 1957 | 1958 | 1959 |
|---|---|---|---|
| Gross receipts from Burke aggregation | $441, 951 | $245, 758 | |
| Gross receipts from other mineral properties | 2, 187, 412 | 2, 536, 780 | $2, 383, 137 |
| Gross receipts from other sources | 90, 375 | 56, 218 | 57, 591 |
|  | 2, 719, 738 | 2, 838, 756 | 2, 440, 728 |

Respondent disallowed in his notice of deficiency the entire amount of the cost depletion claimed by petitioner with respect to the Burke aggregation for the year 1957 with the following explanation:

> On your amended return for 1957, you claimed cost depletion on the Burke aggregation in amount of $1,508,058.55. It is held that no depletion deduction is allowable for the Burke aggregation for reason that your aggregation does not qualify under Section 614(b) of the Internal Revenue Code and your election is, therefore, invalid. Accordingly each property must be treated as a separate property. The only production in this Burke aggregation was from the Hercules property which has no remaining depletable basis. Furthermore, it has been determined that the basis claimed in other properties included in the Burke aggregation was substantially overstated.

Respondent allowed in his notice of deficiency cost depletion with respect to the Burke aggregation for the taxable year 1958 the amount of $8,924.56 applicable to the accepted depletable basis of the Monitor mine and disallowed the remaining amount of depletion claimed on that return. The explanation made in the notice of deficiency with reference to the disallowance was as follows:

> On your amended return for 1958, you claimed cost depletion on Burke aggregation in amount of $1,951,281.72. The only production in this aggregation was from the Hercules property which has no remaining depletable basis. You elected to aggregate operating mineral interests in mines in accordance with provisions of Section 614(c) of the Internal Revenue Code of 1954. It is held that your aggregation is improper since you included worked out and fully depleted mineral interests, as well as undeveloped mineral interests, in your aggregation. Furthermore, it has been determined that your claimed basis in properties included in this Burke aggregation was substantially overstated.

## OPINION

The principal issue here is whether the Burke aggregations are valid for 1957 under the provisions of section 614(b),[1] I.R.C. 1954,

---

[1] SEC. 614. DEFINITION OF PROPERTY.

(b) SPECIAL RULE AS TO OPERATING MINERAL INTERESTS.—

(1) ELECTION TO AGGREGATE SEPARATE INTERESTS.—If a taxpayer owns two or more separate operating mineral interests which constitute part or all of an operating unit, he may elect (for all purposes of this subtitle)—

(A) to form one aggregation of, and to treat as one property, any two or more of such interests; and

(B) to treat as a separate property each such interest which he does not elect to include within the aggregation referred to in subparagraph (A).

For purposes of the preceding sentence, separate operating mineral interests which constitute part or all of an operating unit may be aggregated whether or not they are included in a single tract or parcel of land and whether or not they are included in contiguous tracts or parcels. A taxpayer may not elect to form more than one aggregation of operating mineral interests within any one operating unit.

(2) MANNER AND SCOPE OF ELECTION.—The election provided by paragraph (1) shall be made, for each operating mineral interest in accordance with regulations prescribed by the Secretary or his delegate, not later than the time prescribed by law for filing the return (including extensions thereof) for whichever of the following taxable years is the later: The first taxable year beginning after December 31, 1953, or the first taxable year in which any expenditure for exploration, development, or operation in respect of the separate operating mineral interest is made by the taxpayer after the acquisition of such interest. Such an election shall be binding upon the taxpayer for all subsequent

and for 1958 under the provisions of section 614(c).[2]  Both parties acknowledge that there are no other decisions bearing on the aggregation issue presented herein.  This is a case of cost depletion, not percentage depletion.  The chief advantage in the case of cost depletion is the obtaining of an earlier deduction of capitalized costs which otherwise would be deductible in some later year or years.

Respondent contends that the Burke aggregations for 1957 and 1958 do not qualify under section 614(b) and 614(c) respectively and, consequently, the elections made by the petitioner for both years are invalid.  The petitioner urges the opposite conclusion.  We agree with the petitioner.

---

taxable years, except that the Secretary or his delegate may consent to a different treatment of the interest with respect to which the election has been made.

(3) OPERATING MINERAL INTERESTS DEFINED.—For purposes of this subsection, the term "operating mineral interest" includes only an interest in respect of which the costs of production of the mineral are required to be taken into account by the taxpayer for purposes of computing the 50 percent limitation provided for in section 613, or would be so required if the mine, well, or other natural deposit were in the production stage.

[2] SEC. 614.  DEFINITION OF PROPERTY.

(c) 1958 SPECIAL RULES AS TO OPERATING MINERAL INTERESTS IN MINES.—

(1) ELECTION TO AGGREGATE SEPARATE INTERESTS.—Except in the case of oil and gas wells, if a taxpayer owns two or more separate operating mineral interests which constitute part or all of an operating unit, he may elect (for all purposes of this subtitle)—

(A) to form an aggregation of, and to treat as one property, all such interests owned by him which comprise any one mine or any two or more mines; and

(B) to treat as a separate property each such interest which is not included within an aggregation referred to in subparagraph (A).

For purposes of this paragraph, separate operating mineral interests which constitute part or all of an operating unit may be aggregated whether or not they are included in a single tract or parcel of land and whether or not they are included in contiguous tracts or parcels.  For purposes of this paragraph, a taxpayer may elect to form more than one aggregation of operating mineral interests within any one operating unit; but no aggregation may include any operating mineral interest which is a part of a mine without including all of the operating mineral interests which are a part of such mine in the first taxable year for which the election to aggregate is effective, and any operating mineral interest which thereafter becomes a part of such mine shall be included in such aggregation.

(2) ELECTION TO TREAT A SINGLE INTEREST AS MORE THAN ONE PROPERTY.—Except in the case of oil and gas wells, if a single tract or parcel of land contains a mineral deposit which is being extracted, or will be extracted, by means of two or more mines for which expenditures for development or operation have been made by the taxpayer, then the taxpayer may elect to allocate to such mines, under regulations prescribed by the Secretary or his delegate, all of the tract or parcel of land and of the mineral deposit contained therein, and to treat as a separate property that portion of the tract or parcel of land and of the mineral deposit so allocated to each mine.  A separate property formed pursuant to an election under this paragraph shall be treated as a separate property for all purposes of this subtitle (including this paragraph).  A separate property so formed may, under regulations prescribed by the Secretary or his delegate, be included as a part of an aggregation in accordance with paragraphs (1) and (3), but the provisions of paragraph (4) shall not apply with respect to such separate property.  The election provided by this paragraph may not be made with respect to any property which is a part of an aggregation formed by the taxpayer under paragraph (1) except with the consent of the Secretary or his delegate.

(3) MANNER AND SCOPE OF ELECTION.—

(A) IN GENERAL.—Except as provided in subparagraph (D), the election provided by paragraph (1) shall be made for each operating mineral interest, in accordance with regulations prescribed by the Secretary or his delegate, not later than the time prescribed by law for filing the return (including extensions thereof) for whichever of the following taxable years is the later: The first taxable year beginning after December 31, 1957, or the first taxable year in which any expenditure for development

The history of litigation prior to 1954 establishes the fact that Congress knew that aggregations produce larger depletion deductions. The problem of the mining industry under the 1939 Code was caused by the insistence of the Commissioner that a "property" was each separate interest in each mineral deposit in each tract or parcel of land. For example, if a coal operator had acquired acreage through 10 leases, each lease containing one deposit, from different landowners at different times upon which he operated a coal mine, the Commissioner contended that he had 10 separate properties. This Court consistently rejected this method for computing the depletion allowance. See *Black Mountain Corporation*, 5 T.C. 1117 (1945); *Amherst Coal Co.*, 11 T.C. 209 (1948); and compare *Helvering* v. *Jewell Mining Co.*, 126 F. 2d 1011 (C.A. 8, 1942). What was not positively established by these court cases was whether two or more mines consisting of different tracts of land could be treated as one property. We were of the opinion in the *Amherst Coal Co.* case that where the tracts

or operation in respect of the separate operating mineral interest is made by the taxpayer after the acquisition of such interest. Except as provided in subparagraph (D), the election provided by paragraph (2) shall be made for any property, in accordance with regulations prescribed by the Secretary or his delegate, not later than the time prescribed by law for filing the return (including extensions thereof) for whichever of the following taxable years is the later: The first taxable year beginning after December 31, 1957, or the first taxable year in which expenditures for development or operation of more than one mine in respect of the property are made by the taxpayer after the acquisition of the property. No election may be made pursuant to this subparagraph for any operating mineral interest which constitutes part or all of an operating unit if the taxpayer makes an election pursuant to subparagraph (B) with respect to any operating mineral interest which constitutes part or all of such operating unit.

(B) TAXABLE YEARS BEGINNING BEFORE JANUARY 1, 1958.—The election provided by paragraph (1) may, at the election of the taxpayer, be made for each operating mineral interest, in accordance with regulations prescribed by the Secretary or his delegate, within the time provided in subparagraph (D), for whichever of the following taxable years is the later (not including any taxable year in respect of which an assessment of deficiency is prevented on the date of the enactment of the Technical Amendments Act of 1958 by the operation of any law or rule of law): The first taxable year of the taxpayer which begins after December 31, 1953, and ends after August 16, 1954, or the first taxable year in which any expenditure for development or operation in respect of the separate operating mineral interest is made by the taxpayer after the acquisition of such interest. The election provided by paragraph (2) may, at the election of the taxpayer, be made for any property, in accordance with regulations prescribed by the Secretary or his delegate, within the time prescribed in subparagraph (D), for whichever of the following taxable years is the later (not including any taxable year in respect of which an assessment of deficiency is prevented on the date of the enactment of the Technical Amendments Act of 1958 by the operation of any law or rule of law): The first taxable year beginning after December 31, 1953, and ending after August 16, 1954, or the first taxable year in which expenditures for development or operation of more than one mine in respect of the property are made by the taxpayer after the acquisition of a property.

(C) EFFECT.—An election made under paragraph (1) or (2) shall be binding upon the taxpayer for all subsequent taxable years, except that the Secretary or his delegate may consent to a different treatment of any interest with respect to which an election has been made.

(D) ELECTION AFTER FINAL REGULATIONS.—Notwithstanding any other provision of this paragraph the time for making an election under paragraph (1) or (2) shall not expire prior to the first day of the first month which begins more than 90 days after the date of publication in the Federal Register of final regulations issued under the authority of this subsection.

were contiguous it was the equivalent of a single tract and, therefore, an aggregation of the separate mines into a single property was permissible. The Commissioner filed his nonacquiescence in the *Amherst Coal Co.* decision. Thus, in 1954, what was certain was the prospect of continued litigation because of the Commissioner's adherence to his position that each deposit in each tract was separate property. This caused the mining industry to go to the Congress with a proposal intended to make the rules for determining the depletion allowance consistent with their operating practices.[3] Its suggestion was that the taxpayer be allowed to treat each mine as a property. Congress responded by providing that one aggregation of mineral interests within an operating unit could be treated as a property whether or not such interests were in the same or adjoining tracts or parcels of land.[4]

The legislative history of section 614 is likewise significant. As noted above, Congress first permitted the aggregation or combination of mineral properties for depletion purposes by the enactment of section 614 of the Internal Revenue Code of 1954. When the bill, H.R. 8300, 83d Congress, 2d Session, passed the House of Representatives, section 614 provided that the aggregation provisions would apply "only for the purpose of computing the percentage depletion allowance under section 613." The Senate amended section 614 so that an aggregation would apply for all income tax purposes; i.e., for the purpose of computing *cost* depletion as well as *percentage* depletion and for the purpose of computing gain or loss on a sale or abandonment of the aggregated properties.

Under section 614(b) a taxpayer is permitted to form only one aggregation within a single operating unit. Thus, if the taxpayer elects to aggregate only part of the operating mineral interests[5] within the operating unit,[6] the remaining unaggregated interests have to be treated as separate properties.

The election under section 614(b) to aggregate an operating mineral interest had to be made not later than the time for filing the return for the first taxable year in which the taxpayer made an

---

[3] Hearings before the Committee on Ways and Means, 83d Cong., 1st Sess., on General Revision of the Internal Revenue Code, p. 2116.

[4] See sec. 614(b), I.R.C. 1954. The term "interest" as used in sec. 614(b), relating to the "election to aggregate separate interests," is synonymous with the term "property" defined in sec. 614(a) as "each separate interest in each mineral deposit in each separate tract or parcel of land."

[5] See sec. 1.614-2(b), Income Tax Regs.
Simply stated, the term "operating mineral interest" means that the interest must be that of an operator, one who is responsible for the day-to-day costs of extracting the mineral. In contrast, a "nonoperating mineral interest" includes only such an interest (e.g., royalty) which is not an "operating mineral interest."

[6] The term "operating unit" cannot be defined so accurately that everyone will agree as to the limits of such a unit in every case, but sec. 1.614-2(c), Income Tax Regs., provides four factors which are indicative but not necessarily decisive. These four factors are (1) common field or operating personnel, (2) common supply and maintenance facilities, (3) common processing or treatment plants, and (4) common storage facilities.

expenditure for exploration, development, or operation with respect to the mineral interest. Hence, under section 614(b), if a taxpayer made an expenditure for exploration of a mineral property and wanted at some time to aggregate that interest with another mineral property, the election had to be made at the time of filing the return for the year in which the exploration was done. This was true even though he had not yet found, and did not know whether he would ever find, a commercial mineral deposit in the explored premises. This point is made clear and emphasized in the regulations [7] promulgated under section 614(b).

In 1958 Congress amended the aggregation provisions of section 614 by the enactment of section 37 of the Technical Amendments Act of 1958 (Pub. L. 85–866). The 1958 Act added a new subsection (c) to section 614 to provide liberalized aggregation rules in the case of mines. The new rules did not apply to oil and gas wells.

Section 614(c), as amended, allows a taxpayer to make more than one aggregation within an operating unit. But it also provides that a taxpayer cannot include in an aggregation only part of the operating mineral interests within any mine included in the aggregation. This differs from section 614(b) where a taxpayer had been permitted to include in an aggregation only a part of the operating interests in a mine and leave the remaining operating interests in the mine as separate properties. In addition, section 614(c) provides that a taxpayer can wait until he has made expenditures for the development of a mine before he has to exercise his election to aggregate, but paragraph (4) of section 614(c) provides elaborate rules for the recapture of tax savings enjoyed by the taxpayer by reason of his having failed to make the election to aggregate in the year in which exploration expenditures were first made with respect to a mineral property.

Section 614(c) was made applicable to taxable years beginning after December 31, 1957, but at the election of the taxpayer the provisions could also be applied to prior taxable years governed by the Internal Revenue Code of 1954.

With the passage of the Technical Amendments Act of 1958, the petitioner had a choice of making an aggregation for 1957 under the old rules of section 614(b) or under the new rules of section 614(c). Petitioner elected to form the Burke aggregation for 1957 under the rules of section 614(b). In making the election under that section the petitioner stated:

This election statement is attached to Day Mines, Inc., amended income tax returns for the calendar years 1954, 1955, 1956, and 1957. The elections made herein are effective for all four taxable years, except that if the election cannot apply for the year 1954 under the provisions of section 1.614–2(d) (2) (ii) of the regulations by reason of the possible running of the statute of limitations, then the elections shall be effective for the earliest of such four years for which the

---

[7] See sec. 1.614–2(d) (1), Income Tax Regs.

elections can be made at this time under such provisions of the regulations, and for all subsequent years prior to 1958.

During 1954, 1955, 1956, and 1957 taxpayer, for the purposes of section 614(b) of the Internal Revenue Code of 1954, had the following four (4) operating units as defined in section 1.614–2(c) of the regulations:

WALLACE, IDAHO. This is an operating unit, because it consists of all the operating mineral interests within what is known as the Coeur d'Alene District, which are managed by Day Mines, Inc. It is most conveniently and economically operated as a single working unit because of geographical location, identical management and supervision, common maintenance crews, central assaying, central electrical and mechanical shops, central warehousing, one accounting department, one engineering and geological staff, one centralized purchasing department, one legal department, etc. The principal metal in the ores as mined is lead, the secondary metal is zinc, with substantial silver values.

Since the statute of limitations had run on the years 1954, 1955, and 1956 at the time the election statement was filed, the aggregation applied only to the calendar year 1957.

By the terms of section 614(b)(4), the election made by the petitioner for the year 1957 did not apply to years subsequent to 1957. A separate election for 1958 and subsequent years was filed by petitioner under section 614(c) and a new Burke aggregation was formed to include all the operating mineral interests included in the 1957 Burke aggregation together with the operating mineral interests in 11 other properties, including the Monitor mine. The elections under sections 614(b) and 614(c) were not required to be made—and they were not made—until after the promulgation on January 10, 1961, of the final regulations issued by the Treasury Department.

It seems clear to us that the properties included in the Burke aggregation were "operating mineral interests" within the statutory definition of that term. It is equally clear that the Wallace Operating Unit qualifies as an "operating unit" for the purposes of section 614, particularly in view of the testimony of petitioner's witnesses Henry L. Day and Rollin F. Farmin, and section 1.614–2(c)(4), Income Tax Regs., which provides:

The determination of the taxpayer as to what constitutes an operating unit is to be accepted unless there is a clear and convincing basis for a change in such determination.

Moreover, the 1957 and 1958 Burke aggregations have not been challenged by respondent on the ground that the elections were not timely filed or on the ground that petitioner failed to furnish the necessary information requested by the regulations.

While we think the petitioner meets the literal requirements of section 614, we will nevertheless comment on the various arguments advanced by the respondent.

First, in his notice of deficiency for the taxable year 1958, the respondent asserted as a fact that the mineral interests have been

"worked out and fully depleted." It is true that in some of the mining claims in the Burke aggregation there had been production of ores and the production had ceased prior to 1957. However, a great deal of testimony was received at the trial which established that in the Coeur d'Alene mining district one cannot say that a mine has been worked out and fully depleted merely because at one stage in its history it has been closed down for lack of further known commercial ores. In fact, the Hercules mine itself was closed down in 1925 for lack of further known commercial ores. Yet the mine was not then fully depleted. It actually went back into production in 1957 after post-1947 exploration work disclosed commercial ores below the 1925 bottom of the mine. The story of the Galena mine was given at length. It was twice closed down for lack of any known commercial ores, and today it is in production and ranks as the second largest producer of silver in the United States. The Lucky Friday mine was also closed down and the mining claims sold for taxes. Yet today it is the third largest producer of silver in the United States. The Crescent mine is still another example.

Petitioner's witness Day testified as to the value of holding mining claims in the Coeur d'Alene district and that a number of exploration projects are contemplated within the properties contained in the Burke aggregation. He also testified as to the petitioner's purchase in recent years in the Wallace Operating Unit of mining claims with no known commercial ores. From this evidence we find it difficult to believe that petitioner would continue to hold a mining claim if it thought, as the respondent asserts, that the mining claim is "worked out and fully depleted." Moreover, since the respondent concedes that the so-called "worked out" mineral interests still have a remaining tax basis for depletion purposes, it is fair for us to conclude that what the respondent really means by "worked out and fully depleted" is that the mineral interests *at the present time* have no known commercial ore bodies.

In his opening statement at the trial, respondent's counsel stated that—

we do attack the validity of the aggregation in this case on the ground that for 1957, for example, with only one property which had known mineral reserves and was a producer, petitioner aggregated 41 mineral properties with no known minerals, * * *

This position that a mineral interest cannot be aggregated under section 614 unless it is an interest in a proven deposit is contrary to respondent's own regulations. Section 1.614–2(d)(1) provides:

If an expenditure has been made in respect of a separate operating mineral interest, it is immaterial whether or not any proven deposit has been discovered with respect to such interest when such expenditure has been made.

This statement is then followed by an example which illustrates that the statement means exactly what it says. The election to aggregate must be made for the year of exploration, even though the taxpayer does not know whether there is any mineral to be extracted from the property being explored. The election cannot be deferred until a commercial deposit is found. Aggregation on the basis of expectations is not only permitted but is required under section 614(b).[8] It is plain that section 614(b), in referring to an expenditure for exploration, in no way limits the reference to exploration expenditures which result in the disclosure of minerals—let alone minerals in commercially marketable quantities.

Even if we were to hold, notwithstanding the regulations, that a prospective mineral deposit is not enough—that there must be a mineral deposit in fact—the petitioner's Burke aggregations would still be valid provided the mineral deposit does not have to meet the respondent's test of commercial ore. There can be no dispute over the fact that all of the mining claims included by petitioner in the Burke aggregations contained mineral deposits. Section 1.611–1(d)(4), Income Tax Regs., defines the term "mineral deposit" for the purposes of sections 611 through 616 as follows: " 'Mineral deposit' refers to minerals in place." This definition does not require that the minerals in place exist in commercially marketable quantities, which would be the test of commercial ores.

The main thrust of respondent's argument is that petitioner is claiming "an unconscionable deduction for depletion"; that the petitioner is claiming "enormous tax benefits"; and that petitioner's contentions produce "rash results." Respondent urges that the facts of this case—

demonstrate the gross unreasonableness of the depletion deductions claimed. They derive from the planned arrangement of the aggregations so as to produce the indicated results. The arrangement was purely for the contemplated tax advantages involved, rather than for purposes of operating the properties together. Thus, the matter smacks of a device or manipulation which is subject to scrutiny. It should not be condoned or permitted. It is without support of the statute. It is so contrary to the basic concepts of the depletion allowance (Sec. 611) that it may not be assumed Congress intended the provisions of section 614 to be so interpreted and applied.

In his attempt to show that the petitioner is claiming an unconscionable deduction, the respondent points out that the gross receipts from the Burke aggregation for 1957 (all from the Hercules mine) amounted to only $441,951, and that petitioner originally claimed a deduction for cost depletion for 1957 in the amount of $1,508,058.55.

[8] Sec. 1.614–2(c)(2), Income Tax Regs., provides as follows:
If aggregated, an undeveloped operating mineral interest shall be aggregated only with those interests with which it will be operated as a unit when it reaches the production stage.

And respondent states that the picture for 1958 is even more revealing because the gross receipts from the Burke aggregation in that year amounted to only $245,758, whereas the amount originally claimed as cost depletion for that year was $1,951,281.72. However, what the respondent fails to point out in his brief is that the depletion deductions for 1957 and 1958 will exceed the gross receipts from the Hercules mine for those years no matter how the aggregation issue is decided. If the Burke aggregation for 1957, were held invalid, the depletion deduction for that year under the stipulated facts would nevertheless be approximately $557,478, as compared to gross receipts of $441,951. If the aggregation for 1958 were held invalid, the depletion deduction for that year under the stipulated facts would nevertheless amount to $588,396, as compared to gross receipts of $245,758. Thus it is apparent that the depletion deductions allowable for 1957 and 1958 will *in any event* exceed by a considerable amount the gross receipts from the Burke aggregation for those years. This hardly proves the deduction unconscionable or unreasonable. Moreover, it is meaningless for respondent to compare the gross receipts from mining with the amount of cost depletion claimed or allowable for the year. Cost depletion is not based upon gross income from mining, or with reference to the net income from the property. This is not a case of percentage depletion where the gross receipts and sometimes the net receipts determine the amount of depletion allowable. The regulations under section 611 make it clear that cost depletion is based simply upon two factors: (1) The depletable tax basis of the mineral property (the aggregated property if an aggregation has been made under section 614), and (2) the amount by which the known reserves were depleted during the year. Suffice it to say, we are not persuaded by respondent's argument that general equitable considerations should control the measure of the depletion deduction. Cf. *Lewyt Corp.* v. *Commissioner*, 349 U.S. 237 (1955), where the Supreme Court said:

But the rule that general equitable considerations do not control the measure of deductions or tax benefits cuts both ways. It is as applicable to the Government as to the taxpayer. Congress may be strict or lavish in its allowance of deductions or tax benefits. The formula it writes may be arbitrary and harsh in its applications. But where the benefit claimed by the taxpayer is fairly within the statutory language and the construction sought is in harmony with the statute as an organic whole, the benefits will not be withheld from the taxpayer though they represent an unexpected windfall. * * *

Likewise, there is no basis for respondent's assertion that Congress intended, even though it did not say so, to prohibit aggregations under section 614 (b) or (c) which are made *solely* to save taxes. The Treasury and the Congress have recently recognized that there is no such prohibition.[9]

---

[9] The Secretary of the Treasury stated that taxpayers do have a right to make an aggregation under sec. 614 *solely* in order to increase the depletion deduction. See Part I of Hearings before Committee on Ways and Means on the President's Tax Message,

Petitioner frankly admits that the Burke aggregations were not made without regard to tax consequences. In fact, it is inconceivable that any taxpaper would make an aggregation under section 614 without giving careful consideration to the tax results.[10]

Respondent gives no recognition to the fact that the Burke aggregation for 1958 is binding for all subsequent years and that the petitioner must accept any disadvantages, along with the advantages, flowing from the aggregation.[11]

Next the respondent expresses concern because the elections to aggregate were not required to be filed until 1961 and at that time petitioner knew "exactly what its operations had been" for the years 1957 and 1958, and "did not need to resort to estimates." To be sure, there was a very definite advantage in being able to make elections applicable to 1957 and 1958 without having to guess as to what the factual situation might be for those years. But petitioner cannot be blamed for this. If the respondent's regulations had not been delayed for 6 years, the petitioner would have been required to make its elections to aggregate at a much earlier date. Furthermore, while the respondent considers hindsight as an unfair advantage, it is apparent that Congress did not so consider it. In amending section 614(c) in 1958, Congress provided that the new provisions of subsection (c) could be applied back to the year 1954, if the taxpayer so

---

p. 117. The Committee on Ways and Means adopted the Treasury's recommendation for amending sec. 614(b). See H. Rept. No. 749, 88th Cong., 1st Sess., p. 90. Similarly, the Senate Finance Committee stated (S. Rept. No. 830, 88th Cong., 2d Sess., p. 119) that the amendment of sec. 614(b) would increase revenue collections by $40 million. While both the Treasury and the Congress complained that the oil and gas producers were obtaining large percentage depletion deductions by careful selection of leases, no complaint was made with respect to cost depletion.

[10] For example, the petitioner had several properties in the Wallace Operating Unit which had a negative basis, viz., percentage depletion in past years had exceeded the capitalized cost. Plainly, the Burke aggregation did not become invalid because petitioner deliberately, for tax reasons, excluded those from the aggregation. On the other hand, petitioner included 10 properties in the 1958 aggregation which had a tax basis of zero (but not a negative basis) and which added nothing to the aggregate tax basis of the Burke aggregation. Since no increase in the tax basis of the Burke aggregation resulted from those 10 properties, it is obvious they were not included in the aggregation in order to obtain a tax benefit. As a matter of fact, if ore reserves are developed on those properties, before the remaining cost basis of the Burke aggregation has been recovered through depletion, their inclusion in the 1958 aggregation would produce a tax detriment to petitioner.

[11] For example, the two patented mining claims which comprised the Andrews mine were included in the Burke aggregation for 1958. Since the depletable tax basis of the two claims on Jan. 1, 1957, amounted to only $2,325, the depletion deduction was increased very little by the inclusion of those claims in the aggregation. But if the petitioner in 1964 spends money, with negative results, exploring at depth the two patented mining claims in the Andrews mine, petitioner cannot get a deduction for those expenditures by selling the two claims. Those expenditures (not deductible under sec. 615) must be capitalized and added to the depletable tax basis of the entire Burke aggregation. Since they are in the aggregation, selling the two claims could result in the deduction of only a very small portion of the exploration expenditures. But if the claims had not been included in the Burke aggregation, the exploration expenditures would have been added to the tax basis of the two claims, and the full deduction could be obtained by selling or abandoning the two claims.

desired, and provided in section 614(c)(3)(D) that the election would not have to be made until after the final regulations were promulgated. As previously indicated, these regulations were not promulgated until January 10, 1961.

Although not presented as an objection to the 1958 aggregation in his notice of deficiency or at the trial, the respondent does argue in his brief that the petitioner had only two mines—the Hercules and the Monitor mines—which can be treated as "mines" for the purposes of section 614(c). He points out that the regulations define the term "mine" as excavations or workings "for the purpose of extracting any known mineral deposit except oil and gas deposits." But it appears that the respondent has missed the point as to the reason for the use in section 614(c) of the mine concept. Congress provided in section 614(c)—where more than one aggregation in an operating unit was permitted—that a taxpayer would not be allowed to aggregate part of a mine and leave part of the mine as separate properties. The reason was that Congress did not want taxpayers to compute percentage depletion on those interests in the mine which had a low or zero tax basis and compute cost depletion on those interests in the mine where cost depletion would get a higher deduction than percentage depletion. Insofar as this case is concerned, the mine concept becomes important only if the Burke aggregation included some interests in a mine without including all the interests in that mine. But the respondent has not made any such contention. Thus we hold that the petitioner has not violated the mine rule set forth in section 614(c).

If respondent is urging that an "operating mineral interest" cannot be aggregated under section 614(c) unless it is a part of a mine at the time of the aggregation, then the statute itself establishes that the respondent is in error. See sec. 614(c)(3)(A), *supra*.

Finally, the respondent states that the aggregation of two or more *nonoperating* mineral interests for depletion purposes is restricted by statute and may be allowed by permission of the Commissioner only upon a showing that the principal purpose is not the avoidance of tax. He then takes the position that this same principle should apply equally to *operating* mineral interests such as those involved herein. There is no legal basis whatsoever to support this contention. It is true that section 614(e)(1) provides that the aggregation of *royalty and other nonoperating mineral interests* cannot be made unless the taxpayer shows that the principal purpose is not the avoidance of tax. But section 614(b) and section 614(c) contain no comparable provisions. Surely if Congress had intended the same rule to apply under these two subsections, it would have been a very simple matter to have so provided. However, Congress did not do so. Conse-

quently, the petitioner was not required to obtain, and did not ask for, the Commissioner's consent to make its Burke aggregations. It was perfectly free to make any aggregation allowed under the statute of its operating mineral interests.

Accordingly, we hold that the Burke aggregations for 1957 and 1958 were valid under the provisions of sections 614(b) and 614(c), respectively.

Having resolved the aggregation issue in favor of the petitioner, it follows from this determination, as well as the agreed adjustments set out in the stipulation of facts, that the petitioner sustained certain net operating losses. To reflect these and the other adjustments contained in the stipulation of the parties,

*Decision will be entered under Rule 50.*