### E. J. LAVINO & CO. v. UNITED STATES.
### Civ. A. No. 4791.

District Court, E. D. Pennsylvania.
June 18, 1947.

Randolph W. Childs, of Philadelphia, Pa., for plaintiff.

Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., for defendant.

McGRANERY, District Judge.

This is an action brought against the United States to recover income taxes paid by E. J. Lavino and Company for the years 1939, 1940 and 1941. On the basis of the pleadings and the evidence adduced at trial, I make the following special findings of fact:

1. This action arises under 28 U.S.C.A. § 41(1), (5) and (20). The matter in controversy exceeds, exclusive of interest and costs, the sum of $3000. The plaintiff is a Delaware corporation having its principal business office in Philadelphia. The United States is made the party defendant to this suit because Walter J. Rothensies, the Collector of Internal Revenue for the First District of Pennsylvania, to whom the allegedly overpaid taxes were paid, was not in office at the time of the commencement of this suit.

2. During the years 1939, 1940, 1941, taxpayer owned chromite properties in the Province of Camaguey in the Republic of Cuba.

3. For each of these years, the taxpayer duly filed Federal income tax returns in which there was reflected income received from the operation of the mines, and in each instance it calculated its allowance for depletion by taking 15 per cent of its gross income from the mines (hereafter designated percentage depletion) as permitted for metal mines by Section 114(b) (4) of the Internal Revenue Code, 26 U.S. C.A. Int.Rev.Code, § 114(b) (4). Later, the Commissioner of Internal Revenue disallowed the depletion as computed by the percentage depletion method and substituted a depletion deduction arrived at by making an allowance for each unit of mineral actually taken from the mines (unit depletion). This method resulted in smaller deductions and the taxpayer became liable for additional taxes. After appropriate satisfaction of the tax deficiencies, the taxpayer filed claims for refunds which were rejected by the Commissioner of Internal Revenue. This action was then brought on May 19, 1945.

4. The taxpayer seeks the benefit of the percentage depletion provisions of Section 23(m) and Section 114(b) (4) of the Internal Revenue Code. Section 23(m), during the years at issue, provided that in computing net income there should be allowed as a deduction "In the case of mines, * * * a reasonable allowance for depletion * * *, such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary."

Section 114(b) (4) provided: "(4) Percentage depletion for coal and metal mines and sulphur. The allowance for depletion under section 23(m) shall be, in the case of coal mines, 5 per centum, in the case of metal mines, 15 per centum, and, in the case of sulphur mines or deposits, 23 per

centum, of the gross income from the property during the taxable year * * *."

5. The industrial uses of chromite minerals fall into three groups: metallurgical, refractory, and chemical uses, with the latter relatively less important than the first two. The use of chromite ore for refractory purposes does not involve the making of or reduction to a metal. The mineral, in the form in which it is obtained from the earth, is crushed or ground into bricks or other shapes and these are then used in the linings of high temperature metallurgical furnaces. Substantially all of the materials produced by the taxpayer's mines in 1939, 1940 and 1941 were used by the taxpayer in the production of these refractories for high temperature metallurgical furnaces.

## Discussion

Although the metal chromium might have been extracted from the ore product of taxpayer's mines in the years at issue, by and large, it was not. The appropriateness of the Commissioner's disallowance, therefore, depends upon the definition of "metal mines." The taxpayer's contention is that Congress intended to define a metal mine as one from which metals can be extracted at a profit or commercially. The government necessarily contends that the category "metal mines" did not embrace petitioner's mines in the years at issue; its theory is that metal mines are those mines from which metal actually is obtained. The government contends, as well, that the taxpayer has not proved, even under its own definition, that the Commissioner's disallowance was improper; i. e., that metal could have been extracted from the mines at a profit, but this Court's final view of the case makes it unnecessary to deal with this argument.

The government has marshaled an array of arguments to support its interpretation of the statute. It points to the legislative history of the percentage depletion provision, the prior, the contemporaneous, and the subsequent administrative interpretations, and the enactment of later statutes, as all evincing a Congressional intent to define "metal mines" according to the use of the mine's product. It further contends that practical considerations recommend its definition and that the Commissioner's interpretation of the phrase, if reasonable, should not be set aside merely because another interpretation is possible.

The allowance for depletion is permitted in recognition of the fact that mineral deposits are wasting assets and is intended as compensation to the owner for the exhaustion of his capital assets in natural resources. But "The deduction is permitted as an act of grace." See Helvering v. Bankline Oil Co., 303 U.S. 362, 366, 58 S.Ct. 616, 618, 82 L.Ed. 897. The granting of an arbitrary deduction of a percentage of the gross income derived from the severance of the minerals from the earth is in the interests of convenience and does not change the basic character of the allowance. See Anderson v. Helvering, 310 U. S. 404, 408, 60 S.Ct. 952, 84 L.Ed. 1277. The language of Section 114(b) (4) first appeared in the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts page 520. The allowance of a flat 15 per cent deduction for depletion of a metal mine as a substitute for the computations hitherto used was adopted by Congress after a study of the problem by the Joint Committee on Internal Revenue Taxation. A Preliminary Report on Depletion was submitted to the Committee on September 19, 1929, by L. H. Parker, its Chief of Staff. See Reports to the Joint Committee on Internal Revenue Taxation, 69th Cong. Vol. 1, Part 8. Copies of the Parker report were distributed to the Treasury Department, the mining industry, and others, and hearings were held on the data contained in the report and its recommendations. The recommendations made by the Parker report were urged on the House Ways and Means Committee and the Senate Finance Committee and finally the Senate Finance Committee introduced Section 114(b) (4) as an amendment to the Revenue Bill of 1932. S.Rep. No. 665, 72d Cong., 1st Sess., p. 30, 1939–1 Cum.Bull. (Part 2) 496. It is apparent from the Parker Report that the 15 per cent short cut allowance was based on a study of the problems and experiences of mines actually producing ores from which metals were extracted. The discussion of the previous method for arriving

at depletion allowances, the examples of mines used, the analysis of how the new method of computing depletion would work with its references to smelting and refining, all indicate that the recommendation of a 15 per cent percentage depletion for metal mines contemplated mines from which metal is actually extracted.

■ The Government points out that the Treasury Department, both before and after adoption of the percentage depletion provision, had used the test of whether or not minerals were used for the purpose of obtaining the metals from them in describing the minerals as metallic or nonmetallic. Thus, at the time of enactment of Section 114(b) (4), in defining mineral properties, Treasury Regulation 74, under the Revenue Act of 1928, Art. 221(e), provided: "'Minerals' include *ores of the metals,* coal, oil, gas, and such *nonmetallic substances* as abrasives, * * * barytes, borax, building stone, * * * fluor spar, * * * refractories * * * and talc." (Emphasis supplied.)

The Government contends that "ores of the metals" and "nonmetallic substances" had the same scope as "metal mines" and "mines other than metal," and that the reciprocal of the latter, "nonmetallic substances," obviously described mineral substances which may or may not contain metals, but which were not mined for the purpose of recovering the metals they contained. Furthermore, the Government points out, within the classification of nonmetallic substances were several which had meaning solely as classifications of the nonmetallic use to which minerals were put, including abrasives and refractories. Therefore, in view of the close cooperation of the Treasury and the Joint Committee in the enactment of Section 114(b) (4), "Its substantially contemporaneous expressions of opinion are highly relevant and material evidence of the probable general understanding of the times and of the opinions of the men who probably were active in the drafting of the statute." See White v. Winchester Club, 315 U.S. 32, 41, 62 S.Ct. 425, 430, 86 L.Ed. 619. Furthermore, the substance of Regulation 74 has been promulgated under later Revenue Acts and the Government argues that re-enactment of the Revenue

Acts illustrates specific Congressional approval of this interpretation, as embodied in the Regulation. With this argument the court is less impressed. Cf. Griswold, A Summary of the Regulations Problem, 54 Harv. 398.

The evidence at trial indicated that administrative interpretation has continued further. Mr. L. R. Anderson, chief of the natural resources section of the Bureau of Internal Revenue, testified at trial that the "end use" rule has been the Bureau's policy throughout the years, but was modified slightly in 1938 to meet the "unusual situation of a mine which produced both substances susceptible of a metallic and nonmetallic use from the same property in the same year," by a ruling classifying the mine according to the use for which the product had the greater value. In the war period, when taxpayers producing and using substances for nonmetallic uses were asked by the Government to divert all or a part of their production to the production of metals, there was issued General Counsel's Memorandum 24185 which stated that: "Where a mine produces an ore containing substances which are susceptible to both metallic and nonmetallic uses, or where a man produces both metallic and nonmetallic substances from the same ore body, percentage depletion may be computed for federal income tax purposes on the part sold or used as a metal or metals, and that part sold or used as a nonmetal shall be treated as a nonmetal in determining the nature and extent of the depletion allowance."

The Government further argues that in amending Section 114(b) (4) in 1942 and 1944 to grant percentage depletion to other specified mines as well as metal mines, Congress again approved the principle that metal mines are mines from which the minerals are actually used as source of metals. In 1942 the amendment provided that the same percentage depletion applied to metal mines should be granted to "fluorspar, ball and sagger clay or rock asphalt mines." Revenue Act of 1942, C. 619, 56 Stat. 840, § 145, 26 U.S.C.A. Int.Rev.Code, § 114 note. In 1944 Congress provided that the allowance should be extended to "Metal mines, fluorspar, flake graphite,

vermiculite, beryl, feldspar, mica, talc, lepidolite, sapodumene, barite, ball and sagger clay, or rock asphalt mines, and potash mines or deposits." Revenue Act of 1943, C. 63, 58 Stat. 44, § 124(a), 26 U.S.C.A. Int.Rev.Code, § 114(b) (4). Since most of the mines listed in addition to metal mines are mines from which metals *can* be extracted, the Government's argument is that the definition of "metal mine" intended by Congress must be something other than that suggested by the taxpayer.

All the above is suggestive, in varying degree, of Congressional intent to adopt a definition of "metal mines" similar to that employed by the Commissioner in disallowing percentage depletion in the instant case. This is a situation where experts obviously disagree, as they did at trial, on the definition of the key term, and where, although it is difficult to be positive about Congressional intent on the specific point, the Commissioner's interpretation does not seem unwarranted.

Entirely apart from specific Congressional intent, the taxpayer argues that the Government's "end use" criterion is impractical, and, therefore, unreasonable, pointing out that if it is adopted a metal mine may be classified as such on one day and as a nonmetal mine on the next, depending upon the ultimate use to which its product is put, and that it may be difficult, even impossible, for a taxpayer to determine what that ultimate use is. From the evidence adduced at trial, both these contingencies would seem improbable and, as far as this taxpayer is concerned, both objections for the years at issue are hypothetical. It has stipulated that the end use of substantially all its products for the years at issue was as refractories. Moreover, the first type of objection is met by the proration formula embodied in the General Counsel's Memorandum, for if the objection means anything, it means that a taxpayer will be unable to foretell his tax liabilities with reasonable certainty, and the formula takes care of that. The second objection would seem equally surmountable by a reasonable effort at inquiry among customers, where price, ore content, and past dealings did not make clear the intended ultimate use. Furthermore, on

this plane of administrative efficiency, or practicality, the criterion suggested by taxpayer has practical weaknesses of its own, enough, at any rate, to further the impression that the Commissioner's interpretation of the law in rejecting it is not unreasonable. Thus, during what period would a mine have to be susceptible of producing ore from which metal could be extracted at a profit; during the tax years at issue, or at some future date, during war, during periods of scarcity and emergency stockpiling, or during periods when high grade ore is available at low prices? How much profit is "profitable"; should the absence or presence of competition matter? Finally, it should be remembered that the subject dealt with here is an exceedingly complex one. Of it, the Supreme Court has said, in Helvering v. Wilshire Oil Co., 308 U.S. 90, 102, 103, 60 S.Ct. 18, 25, 84 L.Ed. 101: "In its general aspects under revenue acts depletion is a problem on which taxpayers, government and accountants have expressed a contrariety of opinions. * * * Obfuscation in attempted application of its principles under income tax laws has frequently been the result. * * * Experience and new insight can be expected to produce rather constant change. In sum, the highly technical and involved factors entering into a practical solution of the problem of depletion in administration of the tax laws points to the necessity of interpreting § 23(1) so as to strengthen rather than to weaken the administrative powers to deal with it equitably and reasonably. * * *"

■ To sustain the Commissioner's interpretation, the court need not find that his construction is the only reasonable one, but only that it has a "reasonable basis." See Unemployment Compensation Commission of Territory of Alaska v. Aragan, 329 U.S. 143, 153, 67 S.Ct. 245. The court feels that this requirement has been met, and that taxpayer was correctly allowed to claim depletion on a unit basis only, rather than percentage depletion under 114 (b) (4).

### Conclusions of Law

1. The Court has jurisdiction of the subject matter and the parties of this action.

2. The Commissioner's disallowance of petitioner's claim for percentage depletion was a reasonable interpretation of Section 114(b) (4).

3. Judgment will be entered in favor of defendant.