OPINION. Opper, Judge: Petitioner subjected a part of the output of its coal mine to an oil treatment process designed to make the coal more salable for domestic home heating purposes. The question is whether the price received for coal so treated may be used in its entirety as gross income from the mining property for purposes of computing depletion under section 114 (b) (4) (A), Internal Revenue Code,[1] or whether as respondent has determined a deduction must be made for the part of the value of the product attributable to the oil treatment. The statute was amended in 1943 so that as applicable to this proceeding it reads as follows: (B) Definition of Gross Income From Property. — As used in this paragraph the term “gross income from the property” means the gross income from mining. The term “mining”, as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term “ordinary treatment processes”, as used herein, shall include the following: (i) In the case of coal — cleaning, breaking, sizing, and loading for shipment * * *. The section has been the subject of litigation with respect to talc in International Talc Co., 15 T. C. 981, and the predecessor regulation as to quicksilver in New Idria Quicksilver Mining Co., 2 T. C. 412, revd. (C. A. 9) 144 F. 2d 918. We-have, however, been referred to no judicial authority throwing light on the question we are now called upon to decide. From the statute itself and the cases cited it becomes apparent that the provisions requiring special interpretation are the words “ordinary” and “normally”; and the application to the facts before us of the phrase “commercially marketable mineral product or products.” Petitioner’s position in brief is that it is required to apply oil treatment to the coal it sells in competition with domestic fuels such as gas and oil; that the coal so treated is the commercially marketable product; and that it is an ordinary treatment process normally applied under the circumstances. Only by classifying the stoker-size bituminous coal as a separate “commercially marketable mineral product” can petitioner succeed in any event in qualifying its oil treatment under the statute as “ordinary” or “normally applied.” Compared to all coal, or even to all bituminous coal, any treatment for allaying dust is almost negligible.[2] It would be anomalous to say that a process used in as little as 9y2 per cent of the total coal output was an ordinary one. Moreover, the regulations, if not the statute, treat the phrase “commercially marketable mineral product” as meaning “first commercially marketable mineral product.” Regs. Ill, sec. 29.23 (m)-l. This we think a reasonable interpretation if not the only one possible. The objective is to reach the gross income from “mining.” Mineral products resulting from subsequent processing are not to be considered the result of mining operations. Brea Canon Oil Co., 29 B. T. A. 1134, affd. (C. A. 9) 77 F. 2d 67, certiorari denied 296 U. S. 604. Otherwise any refinement not changing the basic nature of the article would have to be considered a part of the mining activity itself, a result obviously not intended. Granting that by its use of the word “include” the section intended to encompass also other processes used to produce commercially marketable coal;[3] and granting further in the absence of any legislative history to the contrary, that use of the word “the” especially coupled with the term “product or products” includes the possibility that more than one commercially marketable product might constitute the output of a single mine; it hence, nevertheless, remains necessary for the facts as established "by the present record to show not only that the oil treatment of coal is ordinary and that it is normally resorted to, but that oil-treated coal is itself the first commercially marketable mineral product in petitioner’s operation. Can it then be said that the oil-treated coal has been shown on this record to be the first commercially marketable mineral product? We think not. Although oil treatment may have made the product more salable the inescapable fact remains that the first commercially marketable mineral product was the coal itself. That came in different sizes and was apparently sold in different markets. But the evidence does not convince us that any processes comparable to those itemized in the statute [4] were necessary to create a commercially marketable mineral product out of the coal in question. Nor will it do to say that the “commercially marketable mineral product” in the case of domestic stoker coal is necessarily the oil-treated product on the ground that this treatment is necessary to compete with other domestic fuels. Even were the argument otherwise sound the present record shows that some stoker coal was sold for domestic use without oil treatment; and that on the other hand some oil-treated stoker sizes were sold for industrial use.[5] True the proportions in each instance were small but if petitioner’s theory were adopted larger and larger percentages might stray from the norm without depriving the processor of his depletion allowance. Somewhere a line would have to be drawn and it seems simpler and more logical to draw it here since it is the principal rather than the amount with which we are now concerned. Even were we inclined to apply the “end-use” test, cf. E. J. Lavino & Co. v. United States, (E. D., Pa.) 72 F. Supp. 248, and conclude that the coal actually sold and used for domestic stoker purposes was a separate class of “mineral product” we could not here do other than sustain respondent’s determination. The figures already cited show that some portion of petitioner’s oil-treated coal was used for industrial purposes and that a further portion of the larger sizes were oil-treated in spite of the lack of proof of any necessity therefor. Yet the entire proceeds of all oil-treated coal are claimed as gross mining income. To hold that the oil treatment of these items was a mining process and that the income derived from their sale was the gross income from mining would be so obvious a distortion of the record and of the depletion provisions that no such result would in any event be permissible. On that theory any coal producer who chose to augment his gross income by subjecting the coal produced to oil treatment would automatically entitle himself to an increased depletion allowance regardless of any other factor. We conclude that the deficiency was correctly determined. Reviewed by the Court. Decisions will be entered for the respondent. SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION. (b) Basis fob Depletion.— ******* (4) Percentage depletion foe coal * » * (A) In General. — The allowance for depletion under section 23 (m), shall be, In the case of coal mines, 5 per centum * * * of the gross income from the property during the taxable year * * * Total bituminous Percentage and lignite pro- treated to duclion (thousands allay dust— Year of net tons) all methods 1947_. 630,624 8.2 1948. 699,518 8.4 1949. 437/867 9.6 We discard respondent's argument that the processes expressed In the statute exclude all others. The word “Include” which Is there used probably negates the exclusion of other similar words at least within a reasonable application of the rule of efusdem generis. See sec. 37'97 (b), I. R. C. While the purpose of the legislation was twofold, neither one supports petitioner’s present construction. Provisions theretofore existing in the regulations were given the authority of statutory expression ; and certain phases were designed to be more liberally construed than was possible under the contemporaneous rulings of the Treasury. But none of the latter appeared to have applied to coal and the language of the regulation was in that respect imported into the statute In its exact words with the single substitution of the phrase “shall include” for the “are” of the regulation — a change not apparently aimed at any phase of the rulings relating to coal mining. See Hearings before the Committee on Finance, United States Senate, 78th Cong., 1st Sess., pp. 527, 528; S. Kept. No. 627, 78th Cong., 1st Sess. (1943), pp. 23-24. The following figures are taken from petitioner’s exhibit, consisting of a combined summary of petitioner’s tonnage shipped in 2 months during each period in controversy which the parties agree is generally representative of the tonnage shipped during those periods. The sizes are listed in descending order, from large to small. Figures are in tons and fractions of tons. [[Image here]]