HERBERT J. MCCLELLAND AND CLARA H. MCCLELLAND,
PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

CHARLES J. CHAFFIN AND JEANETTE CHAFFIN, PETITIONERS
*V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7629–79, 7630–79.     Filed December 20, 1984.

*John Y. Merrell, John Y. Merrell, Jr.,* and *Timothy J. Callahan,* for the petitioners.
*Ronald P. Campbell,* for the respondent.

PARKER, *Judge*: Respondent determined deficiencies in petitioners' 1975 Federal income taxes in the amounts of $53,951.77 in docket No. 7629–79 and $53,951.77 in docket No. 7630–79. After a concession, the issue for decision is whether, in determining "gross income from mining" under section 613(c)(1) and (2)[1] for purposes of computing their percentage depletion deductions for coal, petitioners (mine operators) may include expenses to transport the coal from the mine site to the plant where their purchaser processed the coal.

## FINDINGS OF FACT

Most of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners in docket No. 7629–79, Herbert J. McClelland (Mr. McClelland) and Clara H. McClelland (Mrs. McClelland), are husband and wife, as are petitioners in docket No. 7630-79, Charles J. Chaffin (Mr. Chaffin) and Jeanette Chaffin (Mrs. Chaffin). Both couples resided in Wise, VA, at the time they filed their respective petitions. Both couples timely filed their respective joint Federal income tax returns for the year 1975 with the Internal Revenue Service Center in Memphis, TN.

During 1975, Mr. McClelland and Mr. Chaffin (hereinafter petitioners) each owned a 50-percent interest in Sterling Mining Co. (Sterling), a general partnership engaged in coal mining in southwest Virginia. Prior to and during 1975, Sterling was engaged in the mining of coal on certain land it leased from the owner, the Pittston Co. (Pittston), a Virginia corporation. Throughout that period, Sterling was a small business, employing an average of six men to run the mining equipment and a foreman to supervise and assist in the mining operations.

Sterling conducted a contour strip-mining operation, mining the coal it leased from Pittston by the surface mining method.[2] First, Sterling used heavy equipment and explosives to remove

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year here involved, unless otherwise indicated. Any reference to "Rules" is to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[2] There are two basic methods of extracting the mineral coal from a seam of coal which runs through a mountain at a given elevation above drainage: (1) Drift or underground mining, and (2) surface mining.

the overburden of timber, vegetation, dirt, and rock off the top of the coal. When the coal was removed from the ground, it consisted of a variety of sizes and often contained dirt, rocks, and other extraneous material. Sterling used front-end loaders to clean and dust extraneous materials from the coal, to break the exposed coal into smaller pieces, and finally to scoop up the broken coal and load it into trucks. In scooping up the coal and loading it in the trucks, however, the operators of the front-end loaders did a good job of breaking and cleaning the coal.

Sterling did not own its own coal processing plant. Except for a nominal amount of coal provided to its employees as required by its contract with the United Mine Workers, Sterling sold all of the coal it mined from the Pittston property during 1975 to the Clinchfield Coal Co. (Clinchfield), a subsidiary of Pittston. Clinchfield would not buy Sterling's coal at the mine site. Instead, the coal purchase contract between Clinchfield and Sterling required Sterling to haul the coal to Clinchfield's processing facility, known as the Wilder #2 Dock. Sterling bore all risk of loss of the coal during such haulage. The Wilder #2 Dock, including all of its associated machinery, was owned by Clinchfield and operated exclusively by its employees. Clinchfield applied to the coal it purchased from Sterling one or more of the coal treatment processes of cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment. See sec. 613(c)(4)(A).

In 1975, Sterling engaged an average of five to six independent contractors to haul its coal from the pit where the coal was uncovered to the Wilder #2 Dock. The truck drivers followed Sterling's instructions in hauling the coal but used their own trucks. During 1975, the distance from the pit to the Wilder #2 Dock varied from one-half to 4½ miles, depending on the area being mined. The Wilder #2 Dock was located within the property that Sterling leased and mined. After the coal was loaded onto the trucks, it was hauled to the Wilder #2 Dock over the flat "bench" area created by the prior removal of the coal, over a private road owned by Clinchfield, and over a public road located within an area bounded by the leased premises. The record does not indicate how much of the haulage was over the "bench" as opposed to over the private and public roads.

At the Wilder #2 Dock, the truck drivers weighed their trucks on a scale and then unloaded the coal into a dumping bin. At the bottom of the dumping bin was a stationary welded grate consisting of a grid pattern of steel bars 12 inches apart. After the coal passed through this stationary grate, it went into a storage bin below. From the storage bin, the coal was conveyed by a belt line down some chutes and into a crusher. From the crusher, the coal was carried on another belt line and loaded into railroad cars. The coal was then transported by the railroad cars either for further processing or directly to Clinchfield's customers. Once the coal was loaded into cars at the dock or after further processing, if such was required, the cars were weighed. Clinchfield paid Sterling based upon the weight of the coal in the railroad cars.

Under its contract with Clinchfield, Sterling was obligated to deliver its coal through the steel grate at the Wilder #2 Dock and into the storage bin below that grate. As noted earlier, the operators of the front-end loaders at the mine had done a good job of breaking up the coal in loading it into the trucks, and additional incidental breakage occurred naturally during the hauling. However, in virtually every load of coal, there were a few pieces of coal that either were too large to pass through the 12-inch spaces in the grate or were small enough to pass through the grate but jammed together between the grate spaces. For virtually every load of coal, the truck driver spent an average of about 5 minutes using a sledge hammer or pickax to reduce the size of larger lumps of coal or to force jammed pieces of coal through the grate and into the storage bin. The percentage of coal that had to be hit with a pickax or sledge hammer in order to get it through the steel grate was very low in comparison to the total amount of coal dumped. The record does not indicate how much of this small percentage of the coal was larger than the 12-inch grate and how much merely jammed on the stationary grate. The grate served to prevent pieces of coal, rock, or any other material larger than 12 inches from passing into the storage bin and damaging Clinchfield's processing equipment. Clinch-field's particular mechanical crusher would not accept coal in chunks larger than 12 inches in diameter.

During 1975, the truck drivers were responsible for ensuring that the coal passed through the grate. However, Sterling paid

the truck drivers the same fee for hauling the coal regardless of the time they spent, if any, in forcing the coal through the grate. The truck drivers were eager to make as many trips as possible per day and wanted to spend as little time as possible dumping their loads. Occasionally, a driver would not wait for the preceding load to go through the grate and into the storage bin below, but would "shake a load off" his truck in such a way as to mound the coal up in the dumping bin. At most, the dumping bin would hold two truck loads when this was done. Whenever there were oversize lumps or jammed pieces of coal, the truck drivers were almost always the persons who forced the coal through the grate. On a few occasions, Sterling's foreman or an idle employee of Sterling helped the truck drivers hit the coal through the grate. None of Clinchfield's employees ever assisted either the truck drivers or Sterling's employees in forcing any coal through the grate.

In 1975, Sterling's total cost of hauling its coal from the pit to the Wilder #2 Dock was $156,729.61. On its 1975 partnership return, Sterling computed its gross income from mining for purposes of percentage depletion as the gross sales price of its coal to Clinchfield including costs of transportation to the Wilder #2 Dock and excluding certain royalties and other payments. On the joint returns for 1975 filed with their respective spouses, Mr. McClelland and Mr. Chaffin claimed their distributive shares of the percentage depletion deduction reported on Sterling's partnership return.

On examination, respondent determined that the costs Sterling incurred in hauling its coal to the Wilder #2 Dock should be deducted from the gross sales price of the coal to Clinchfield to determine Sterling's gross income from mining. As a result, respondent reduced Sterling's percentage depletion deduction by $15,673 and reduced each partner's distributive share of that deduction by $7,836. By executing Forms 870, Mr. McClelland and Mr. Chaffin consented to assessment of the deficiencies and paid the deficiencies resulting from this determination.

Subsequently, respondent mailed notices of deficiency to Mr. McClelland and Mr. Chaffin and their respective spouses, disallowing their entire distributive shares of Sterling's percentage depletion deduction on the ground that "Sterling Mining Company did not obtain an economic interest under a

lease from Pittston Company in coal mined and sold to Clinchfield Coal Company."

In their respective petitions, Mr. McClelland and Mr. Chaffin asserted (1) that there were no deficiencies in tax for 1975 since Sterling had the requisite economic interest in the coal in place, and (2) that petitioners had overpaid their taxes in the respective amounts of $5,485.56 each due to respondent's disallowance of Sterling's coal haulage cost to the Wilder #2 Dock as part of its gross income from mining. Respondent now concedes that Sterling had an economic interest in the coal that it mined under its lease with Pittston, so consequently there are no deficiencies in tax for 1975. Accordingly, the dispute remaining is whether Mr. McClelland and Mr. Chaffin overpaid their 1975 taxes as claimed in their petitions.

### ULTIMATE FINDING OF FACT

The incidental activity in which Sterling's independent truck driver or, on occasion, Sterling's own employee, used a sledge hammer or pickax to force a few oversize lumps or smaller jammed pieces of coal through the stationary steel grate upon delivery of the coal to the purchaser at the Wilder #2 Dock does not constitute a mining treatment process.

### OPINION

Section 611(a) grants miners as a deduction in computing their taxable income a "reasonable allowance for depletion." Under section 613(a), this allowance is prescribed as a specified percentage of the "gross income from the property," not to exceed 50 percent of the taxable income from the property computed without the allowance. The specified percentage for coal is 10 percent. Sec. 613(b)(4). The term "gross income from the property" is defined in section 613(c)(1) as "the gross income from mining." Under section 613(c)(2), "mining," for purposes of percentage depletion, has three components—(1) extraction from the ground, (2) certain qualifying treatment processes considered as mining, and (3) certain qualifying transportation ("mining transportation") from the mine to the plants or mills where the qualifying mining treatment processes are applied. Secs. 1.613–4(a), 1.613–4(f), Income Tax Regs.;

see note 3 *infra.* The treatment processes considered as mining by section 613(c)(2) are enumerated in section 613(c)(4).

The issue we must decide is whether Sterling's cost of transporting coal from the mine site to the processing facility of its purchaser, Clinchfield, is to be deducted from its gross sales to Clinchfield in determining Sterling's "gross income from mining" for computing its percentage depletion allowance. The first question is whether the mine owner or operator itself (Sterling) must apply a section 613(c)(4) treatment process in order for its transportation of the ore or mineral to a processing facility to be treated as mining under section 613(c)(2). If not, that ends our inquiry since Clinchfield clearly applied qualifying treatment processes to the coal it purchased. If so, we must determine whether Sterling itself applied such a mining treatment process. Specifically, the second question is whether the activity performed by Sterling's independent truck driver, or occasionally by its own employee, after unloading the coal into Clinchfield's dumping bin—using a sledge hammer or a pickax to force any oversize or jammed lumps of coal through the 12-by-12-inch stationary steel grate at the bottom of the dumping bin (the "hammer activity")—constituted a coal mining treatment process under section 613(c)(4)(A). If we answer this negatively, there is a final issue involving the portion of the transportation cost relating to haulage of the coal over the "bench," i.e., over the flat areas created by the prior removal of the coal. This alternative argument seems to be a claim that this portion of the transportation represents not "mining transportation" which would be governed by our disposition of the first two issues but represents a part of the extraction process itself so as to be deemed "mining."

# I

Petitioners contend that because Sterling's purchaser, Clinchfield, applied at least one of the coal treatment processes specified in section 613(c)(4)(A), Sterling's delivery of the coal from the mine to Clinchfield's facility was mining transportation within the meaning of section 613(c)(2). A careful reading of the language of section 613(c)(2) and section 613(c)(4), however, supports respondent's position that the mine owner or operator itself (Sterling) must perform a

qualifying mining treatment process for its transportation to be considered as "mining."

Section 613(c)(2), defines mining to include:

not merely the extraction of the ores or minerals from the ground but also the treatment processes considered as mining *described in paragraph (4)* (and the treatment processes necessary or incidental thereto), and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which *such treatment processes* are applied thereto as is not in excess of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills. [Emphasis supplied.]

The characterization of transportation of an ore or mineral as mining is thus dependent upon the characterization of the treatment processes applied to the ore or mineral at the plant or mill to which it has been transported. Section 613(c)(2) defines as mining those treatment processes "described in paragraph (4) (and the treatment processes necessary or incidental thereto)." As it pertains to this case, section 613(c)(4) provides:

(4) TREATMENT PROCESSES CONSIDERED AS MINING.—The following treatment processes *where applied by the mine owner or operator* shall be considered as mining to the extent they are applied to the ore or mineral in respect of which he is entitled to a deduction for depletion under section 611:

(A) In the case of coal—cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment; * * *

[Emphasis supplied.]

The prefatory language of section 613(c)(4) thus expressly limits its specified treatment processes to those "where applied by the mine owner or operator."

As specifically limited by the statutory language, the only treatment processes considered as mining under section 613(c)(2) are those applied by the mine owner or operator. Transportation is defined as mining only where the ore or mineral is transported to the plant or mill "in which *such* treatment processes are applied thereto." The phrase "such treatment process" refers back to its last antecedent, "treatment processes considered as mining described in paragraph (4) (and those treatment processes necessary or incidental thereto)," and these treatment processes are allowable only "where applied by the mine owner or operator." See 2A J.

Sutherland, Statutory Construction, sec. 47.33, at 159 (4th ed. 1982 Supp.). Consequently, under the literal language of the statute, transportation is mining under section 613(c)(2) only when it is to a plant or mill where the mine owner or operator itself applies a qualifying treatment process. Respondent's regulations similarly reflect this literal construction.[3]

Accordingly, there is no textual basis in either the statute or the regulations for petitioners' construction of section 613(c) as permitting the purchaser (Clinchfield) to apply the qualifying mining treatment processes for purposes of allowable "mining transportation." Petitioners' construction of the phrase "such treatment processes" in section 613(c)(2) would incorporate the specifically enumerated treatment processes of subparagraph (A) of section 613(c)(4) but would wholly ignore the overall prefatory limitation ("where applied by the mine owner or

---

[3]In pertinent part, sec. 1.613-4, Income Tax Regs., provides as follows:

Sec. 1.613-4. Gross income from the property in the case of minerals other than oil and gas.
(a) *In general.* * * * The term "gross income from the property," as used in section 613(c)(1), means, in the case of a mineral property other than an oil or gas property, gross income from mining. "Gross income from mining" is that amount of income which is attributable to the extraction of the ores or minerals from the ground and the application of mining processes, including mining transportation. For the purpose of this section, * * * "treatment processes considered as mining" * * * will be referred to as "mining processes." Processes, including packaging and transportation, which do not qualify as mining will be referred to as "nonmining processes." Also for the purpose of this section, transportation which qualifies as "mining" will be referred to as "mining transportation" and transportation which does not qualify as "mining" will be referred to as "nonmining transportation."

*       *       *       *       *       *       *

(f) *Definition of mining*—(1) *In general.* The term "mining" includes only—
(i) The extraction of ores or minerals from the ground;
(ii) Mining processes, as described in subparagraphs (2) through (6) of this paragraph; and
(iii) So much of the transportation (whether or not by common carrier) of ores or minerals from the point of extraction of the ores or minerals from the ground to the plants or mills in which the processes referred to in subdivision (ii) of this subparagraph are applied thereto as is not in excess of 50 miles * * *
(2) *Definition of mining processes.* (i) As used in subparagraph (1)(ii) of this paragraph, the term "mining processes" means, * * * the following processes (and the processes necessary or incidental thereto):
(a) In the case of coal—cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment * * *

*       *       *       *       *       *       *

(iv) The term "mining" does not include purchasing minerals from another. Accordingly, *the processes listed in this paragraph shall be considered as mining processes only to the extent that they are applied by a mine owner or operator to an ore or mineral in respect of which he is entitled to a deduction for depletion under section 611.* The application of these processes to purchased ores, minerals, or materials does not constitute mining.
[Emphasis supplied.]

operator") in section 613(c)(4) itself. Section 1.613–4(f)(2)(iv), Income Tax Regs., provides that—

The term "mining" does not include purchasing minerals from another. Accordingly, *the processes listed in this paragraph shall be considered as mining processes only to the extent that they are applied by a mine owner or operator to an ore or mineral in respect of which he is entitled to a deduction for depletion under section 611.* The application of these processes to purchased ores, minerals, or materials does not constitute mining. [Emphasis supplied.]

This legislative regulation is consistent with, and is a reasonable construction of, the statutory language. *Commissioner v. Portland Cement Co.*, 450 U.S. 156, 169 (1981); *Rowe v. United States*, 655 F.2d 1065, 1067–1068 (1981). We would not invalidate this legislative regulation if petitioners were asking us to do so, which apparently they are not.[4]

Petitioners' argument for their construction of section 613(c)(2) and (4) is based largely on their view of the governing law prior to 1960 and their assessment of the intent of Congress in amending section 613(c)(2) and (4).[5] Prior to 1960, section 613(c)(2) defined mining as—

---

[4]Instead, petitioners argue that sec. 1.613–4(f)(2)(iv), Income Tax Regs., is not a restriction on transportation but is merely designed to prevent a purchaser/processor from claiming depletion for the performance of these processes. This seems to be part of petitioners' overall argument that the miner need apply these specified mining treatment processes only if he wants to include the processes themselves in his gross income from mining. We disagree. The statute is clear that transportation is included in gross income from mining only if it is transportation from the mine to the plant or mill where the mine owner or operator applies certain specified mining treatment processes. The regulation reasonably implements the statute and indeed tracks the statute rather closely. Sec. 1.613–4(f) of the regulation, including (f)(2)(iv), defines "mining," and only if the transportation comes within the definition of "mining" is it allowable as "mining transportation." The definition of "mining" in the statute and in this regulation is not only a restriction on transportation but is the key to the allowance or disallowance of transportation as part of mining. Instead of using the terms in the regulations of "mining transportation," which is part of gross income from mining, and "nonmining transportation," which is not, petitioners set up categories they call "processing transportation" and "transportation to consumers," terms that tend to obfuscate rather than clarify the issues.

[5]The Court having concluded that the above legislative regulation is reasonable and consistent with the statute, that should end the matter. However, we will consider petitioners' further arguments that have already been presented to and rejected by the Court of Claims (now the Court of Appeals for the Federal Circuit) in *Rowe v. United States*, 655 F.2d 1065, 1069–1070 (1981). While we also agree with the *Rowe* court's analysis and conclusion on these additional arguments, we will address them at somewhat more length than did the court. Petitioners, having the benefits of the *Rowe* opinion before them, seem to have favored this Court with a rather extended elaboration of their arguments. Petitioners ask us to find that the *Rowe* case was incorrectly decided; however, our only disagreement with the *Rowe* court might be with its repeated reassurances to those taxpayers that their arguments were "respectable" and their interpretations "nonfrivolous." Perhaps in this case, petitioners' arguments and interpretations have suffered from repetition and overexposure so as to appear to this Court to be merely lengthy, attenuated

not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes *normally applied by mine owners or operators* in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which *the ordinary treatment processes are applied thereto* as is not in excess of 50 miles unless the Secretary or his delegate finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills. [Emphasis supplied.]

Unlike the current statute, section 613(c)(4), as it read prior to 1960,[6] did not expressly state that the enumerated treatment processes must be applied by the mine owner or operator himself. But see note 12 *infra*. Prior to 1960, the ordinary treatment processes defined in section 613(c)(4) were nonexclusive examples, not expressly limiting definitions. See *Dragon Cement Co. v. United States*, 244 F.2d 513, 516 (1st Cir. 1957), cert. denied 355 U.S. 833 (1957); *Black Mountain Corp. v. Commissioner*, 21 T.C. 746, 756 n. 3 (1954). Under the earlier text of section 613(c)(2), quoted above, the treatment processes considered as mining were those "normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." Under this general language, many court decisions, beginning with *United States v. Cherokee Brick & Tile Co.*, 218 F.2d 424 (5th Cir. 1955), had interpreted the phrase "commercially marketable" to allow percentage depletion on the gross income derived from the manufactured products (bricks and tiles) of integrated miner manufacturers.

In 1960, two parallel developments halted this expansive interpretation of the percentage depletion provision by some of the Circuit Courts. First, in *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76 (1960), the Supreme Court narrowed the scope of the "commercially marketable" test, holding that the cutoff point where gross income from mining stopped for the

---

arguments either attacking or ignoring clear and unambiguous statutory language and the pertinent legislative regulations.

[6]Prior to 1960, sec. 613(c)(4)(A) provided that:

(4) ORDINARY TREATMENT PROCESSES.—The term "ordinary treatment processes" *includes* the following:
(A) In the case of coal—cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment;
[Emphasis supplied.]

.

percentage depletion allowance was where the mineral itself first became "ready for industrial use or consumption." *United States v. Cannelton Sewer Pipe Co., supra* at 86.[7] While the Supreme Court was considering and deciding the *Cannelton* case, Congress amended section 613(c)(2) and (c)(4) to read essentially as it does now.[8] In this amending legislation, known as the Gore amendment,[9] Congress eliminated the "commercially marketable" test for treatment processes to be considered as mining, choosing instead to draw a clear line between mining and manufacturing by listing those treatment processes it considered "directly associated with mining, through long mining practice." 106 Cong. Rec. 14514 (1960) (Statement of Senator Byrd).[10]

Although the Gore amendment also changed slightly the wording of the transportation clause, Congress intended the definition of mining in section 613(c)(2) to include "(within the same limits as provided by existing law) transportation to the plants or mills in which the treatment processes are applied." Conf. Rept. 2005, 86th Cong., 2d Sess. (1960), 1960–2 C.B. 741, 746. Building upon this statement, petitioners argue that under pre-1960 law, transportation to a processing facility was considered as "mining" regardless of who applied the treatment processes, and consequently, section 613(c)(2), as it reads after the Gore amendment, should not be construed to require that the mine owner or operator itself apply a treatment process for its transportation to be deemed mining. Petitioners have not cited, nor have we found, any regulations, rulings, or cases dealing with the question under pre-1960 law.[11] If

---

[7]The lower court had construed the phrase "commercially marketable mineral product" to mean the first product commercially marketable at a profit. *Cannelton Sewer Pipe Co. v. United States*, 268 F.2d 334 (7th Cir. 1959), revd. 364 U.S. 76 (1960); see also *Commissioner v. Iowa Limestone Co.*, 269 F.2d 398, 401–403 (8th Cir. 1959), affg. 28 T.C. 881 (1957). The Supreme Court rejected the lower court's "profitability" test and looked instead to the stage of extraction and processing at which there appeared a commercial market for the mineral. *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. at 86–89.

[8]The Supreme Court decided *Cannelton* on June 27, 1960, the same day the Conference report on the amending legislation was presented to the House and Senate. See 106 Cong. Rec. 14525, 14542 (1960).

[9]Sec. 302(b), Public Debt and Tax Rate Extension Act of 1960, Pub. L. 86–564, 74 Stat. 290, 292 (1960), 1960–2 C.B. 681, 683–684.

[10]Senator Byrd was chairman of the Senate Finance Committee and one of the Senate's Conference managers of the Gore amendment.

[11]The *Rowe* court reached a similar conclusion, so petitioners have had ample notice to present such materials if there are regulations, rulings, or cases dealing with the pre-1960 law. However, on brief to this Court, petitioners took strong exception to the *Rowe* court's further statement that

anything, the text of the pre-1960 statute tends to support respondent's view of both present and prior law.[12] The best that can be said for petitioners' argument is that prior law may have been unsettled. That is simply insufficient to prevail against the logical, literal wording of the present statute. Moreover, the clear, explicit language of the present sections 613(c)(2) and 613(c)(4), requiring that the mining treatment processes must be applied by the mine owner or operator itself, puts to rest any lingering doubt.

Nevertheless, pointing to what they perceive as the broad overall purpose of Congress in enacting the Gore amendment and to the Supreme Court's reasoning in its construction of pre-1960 law in *Cannelton*, petitioners ask for a policy-oriented construction of the transportation clause in order to close the inventive loophole they have fabricated from pre-1960 law. The practical effect of the Circuit Court's decision in *Cannelton*, and of similar decisions in other Circuit Courts, was to grant to integrated miner-manufacturers greater percentage depletion allowances than those granted to nonintegrated miners.[13] In *Cannelton*, the Supreme Court construed the pre-1960 version of section 613(c)(2) to require equal treatment of

there "are no rulings, no course-of-practice, which [are in the taxpayer's] favor." 655 F.2d at 1070. Petitioners insist that "prior to 1960 and indeed up until at least 1970, respondent consistently allowed miners to include processing [sic] transportation in their gross income from mining regardless of whether the miner applied the treatment processes." However, petitioners have presented nothing except their ipse dixit to support their assertion. In any event, even if there had been some such prior administrative practice, that would not change our conclusion in this case in view of the clear language of the statute after the Gore amendment. Neither respondent nor this Court is bound by a prior erroneous administrative interpretation or practice. *Dixon v. United States*, 381 U.S. 68 (1965); *Automobile Club v. Commissioner*, 353 U.S. 180 (1957).

[12]Prior to the Gore amendment, sec. 613(c)(2) defined as mining those "ordinary treatment processes normally *applied by mine owners or operators* in order to obtain the commercially marketable product or products." (Emphasis supplied.) The obvious construction of this clause is that the mine owner or operator itself must apply the treatment process. Cf. *Chicago Mines Co. v. Commissioner*, 7 T.C. 1103, 1109–1111 (1946), affd. 164 F.2d 785 (10th Cir. 1947), cert. denied 333 U.S. 881 (1948). In light of the wording of the transportation clause of sec. 613(c)(2) before the Gore amendment "plants or mills in which the ordinary treatment processes are applied thereto," and its location within the same subparagraph as the language that the mine owner or operator itself apply the ordinary treatment processes, respondent's textual conclusion is stronger than petitioners' interpretation of that prior law. See also *Rowe v. United States*, 655 F.2d at 1069 nn. 4 & 5, 1070 n. 6.

[13]Under the test applied by the Circuit Court in *Cannelton*, because the taxpayer's first commercially marketable product was its finished, manufactured product (sewer pipe), its gross income from mining for purposes of computing its percentage depletion allowances was based on its gross sales of the manufactured product. This figure was markedly higher than gross sales of a nonintegrated miner who sold comparable quantities of his product after extraction and minimal processing, giving the integrated miner-manufacturers markedly higher percentage depletion allowances.

integrated miner-manufacturers and nonintegrated miners in determining their allowances for percentage depletion. In other words, the cutoff point for "gross income from mining" was where the ordinary miner shipped the product of his mine.[14] In enacting the Gore amendment, Congress evidenced the same concern over discriminatory treatment of integrated miner-manufacturers and nonintegrated miners, specifically noting that the disparate treatment fostered the trend towards vertical integration of production and distribution, and hence fostered monopoly. See 106 Cong. Rec. 13217, 13221 (1960) (Statements of Senator Gore); 106 Cong. Rec. at 13223 (Statement of Senator Proxmire); 106 Cong. Rec. at 13239 (Colloquy of Senators Gore and Symington).

It is unquestionable that the antitrust laws represent a fundamental economic policy of this nation. See *Federal Maritime Commission v. Seatrain Lines, Inc.*, 411 U.S. 726, 733 (1973); *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 218 (1966). It is equally clear that vertical integration can, in some instances, violate antitrust laws. See *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948). Petitioners argue that respondent's plain language construction of section 613(c)(2) treats an integrated miner-processor more favorably than the nonintegrated miner who sells his extracted mineral without any further processing. Petitioners contend that this fosters integration of extraction and processing. Citing several cases for the proposition that the Internal Revenue laws should not be construed to violate fundamental governmental or public policies,[15] petitioners argue that we should not accept respondent's literal construction of section 613(c)(2) because it fosters vertical integration in violation of the antitrust laws. We do not agree.

---

[14]"[I]n each of the three basic percentage depletion Acts the Congress indicated that integrated operators should not receive preferred treatment. * * * Ever since the first percentage depletion statute, the cut-off point where 'gross income from mining' stopped has been the same, *i.e.*, where the ordinary miner shipped the product of his mine. [Taxpayer's] formula would not only give it a preference over the ordinary nonintegrated miner, but also would grant it a decided competitive advantage over its nonintegrated manufacturer competitor. Congress never intended that depletion create such a discriminatory situation. As we see it, the miner-manufacturer is but selling to himself the crude mineral that he mines, insofar as the depletion allowance is concerned. [*United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76, 87 (1960).]"

[15]For this proposition, petitioners cite *Tank Truck Rentals v. Commissioner*, 356 U.S. 30 (1958); *Kosydar v. Wolman*, 353 F. Supp. 744 (S.D. Ohio 1972); and *Green v. Connally*, 330 F. Supp. 1150 (D. D.C. 1971), affd. per curiam sub nom. *Coit v. Green*, 404 U.S. 997 (1971). See also *Bob Jones University v. United States*, 461 U.S. 574 (1983).

First, whatever vertical integration that the plain language of section 613(c)(2) and (4) might promote is still within the extractive and mineral processing (mining) stage of the industry. *Cannelton* and the floor debate of the Gore amendment addressed the integration of mining and manufacturing, which is much more monopolistic than any alleged integration fostered within the mining stage. Second, as respondent aptly notes, petitioners' construction is also discriminatory, denying treatment of transportation as mining to miners selling unprocessed ores or minerals whose customers do not apply qualifying treatment processes. Congress chose to consider certain mining treatment processes as part of "mining," but if the miner chooses to sell the product of his mine without application of those enumerated processes, "mining" and "gross income from mining" have stopped as to him. Third, the mere fact of vertical integration is not a per se violation of the antitrust laws: "the legality of vertical integration under the Sherman Act turns on (1) the purpose or intent with which it was conceived, or (2) the power it creates and the attendant purpose or intent." *United States v. Paramount Pictures, Inc.*, 334 U.S. at 174. Fundamentally, we think that these subtle questions of relative "discrimination" and monopolistic incentives are more properly addressed to the Congress. In *Rowe v. United States, supra,* the Court of Claims addressed this same issue and argument. We agree with the *Rowe* court's statement (655 F.2d at 1070) that:

We need not balance these opposing contentions as if we were the legislators. We see no general, overall policy in the tax-depletion legislation pushing against integration. Instead, depletion law appears to us to have been influenced by a number of different and possibly conflicting interests, some special and some more widespread. There is no all-dominating pattern, but a variety of separate adjustments. In this instance we cannot say that the reading that hugs the text of the statute and regulations necessarily leads to absurd or unwanted results. In ascertaining Congress' intent in this area, it is more helpful to look for guidance to the particular statute and regulations, rather than attempting to interpret applicable law in a distorted fashion simply to reconcile it with vague notions of overall public policy not clearly incorporated in the statute. This is especially true where, as here, the [legislative] Treasury regulations are entitled to greater than usual deference because "Congress obviously could not foresee the multifarious circumstances which would involve questions of depletion. * * * "*Portland Cement, supra* [450 U.S. 156, 169 (1981)] at 1045.

We cannot accept petitioners' argument that their reading of the statute "is the only one which harmonizes with the legislative history of the statute, public policy and mining realities." In fact, we think that the statutory language itself is sufficiently clear, and the legislative regulations reasonable and consistent with the statute, so that any resort to legislative history or to policy considerations is uncalled for in this case. As to "mining realities," petitioners have not presented any facts to show us what they are and whether or how they might impact upon a case such as this one. Needless to say, we agree with *Rowe v. United States, supra,* and reject petitioners' arguments. See also *Nicewonder v. United States,* an unreported decision (W.D. Va. 1981, 48 AFTR 2d 81–6039, 81–2 USTC par. 9723), reaching the same conclusion. We agree with the *Rowe* and *Nicewonder* courts and hold that Sterling's transportation of its coal will be deemed mining only if Sterling itself applied a coal treatment process qualifying under sections 613(c)(2) and 613(c)(4)(A).

## II

Petitioners contend that Sterling's "hammer activity," described above, constitutes the coal mining treatment process of "breaking." Petitioners conclude that this "mining treatment process" performed by Sterling's truck drivers and employees at Clinchfield's premises after transporting the coal from the mine renders the transportation "mining" under section 613(c)(2). We do not agree.

It cannot seriously be disputed that the result of the hammer activity was a "breaking" of a small amount of the coal, no matter what technical or general definition of that term is posited. See Bureau of Mines, A Dictionary of Mining, Mineral and Related Terms 136 (1968); Webster's New Twentieth Century Dictionary 223 (2d ed. 1968). For virtually each truck load of coal, a few oversize lumps of coal were reduced in size to go through the grate. Respondent does not suggest otherwise; rather, respondent argues that the hammer activity, while breaking a few pieces of the coal, did not constitute a "mining treatment process."

Both parties presented expert testimony regarding the meaning of the phrase "treatment process of breaking" within the coal mining industry. While we are not prepared to accept

the narrow conclusion of respondent's expert that this phrase in the industry refers solely to the use of a mechanical device, neither are we satisfied that petitioners' expert has adequately shown that the phrase, as used within the industry, includes Sterling's incidental hammer activity.[16] Petitioners' expert, a mining engineer and attorney, described in detail numerous ways in which coal can be broken, including the fortuity of pieces of coal striking against each other. However, he did not testify as to which of those methods were generally used within the industry, and which were considered a mining treatment process within the industry. In fact, his testimony was singularly devoid of evidence regarding the specific methods and processes employed by other coal miners. Compare *Black Mountain Corp. v. Commissioner, supra.* Petitioners' reliance upon a brief excerpt from a 1945 mining text by Arthur Taggart describing an activity called "sledging" is not sufficient to establish industry practices. The excerpt does not specifically refer to coal mining, nor does its context indicate whether it is a description of contemporary (circa 1945) or historic industry practices. In short, petitioners have not convinced us that the coal mining treatment process of breaking, as that phrase is used in the industry, includes Sterling's crude and sporadic "hammer activity." Rule 142(a).

More importantly, though, resolution of this question should not devolve to simply a "battle of the experts." As we stated in *Barton Mines Corp. v. Commissioner,* 53 T.C. 241, 254 (1969), affd. in part, revd. in part, and remanded in part 446 F.2d 981 (2d Cir. 1971), we have concluded that—

although section 613(c) lists processes which shall and shall not be considered as mining, a mechanical application of the statutory language was not intended; we do not believe that Congress meant for us to embark upon the task of determining which of opposing parties' technical descriptions of a disputed process more precisely fits a statutory term. Rather, it is necessary to determine the function served by the particular process in question. * * *

---

[16]Both parties have indulged in gratuitous and unsubstantiated attacks on the opponent's expert. There is nothing in the record to show bias on the part of either witness, and the Court is satisfied there is none. However, the Court found the testimony of both experts to be of little practical value in resolving this particular case. Respondent's expert discussed mostly large-scale mining operations and the commercial realities of certain types of operations completely unlike Sterling's operation. While petitioners' expert had much more experience with small mining operations of the scale Sterling conducted, he did not furnish any evidence as to the mining treatment process of breaking applied by other small mine owners or operators.

See also *Ranchers Exploration & Dev. Corp. v. United States*, 634 F.2d 487, 490–491 (10th Cir. 1980); *Union Carbide Corp. v. Commissioner*, 75 T.C. 220, 237–238 (1980), affd. 671 F.2d 67 (2d Cir. 1982). We do not think that the function of Sterling's incidental hammer activity was to process the coal.

Sterling loaded its coal into trucks at the mine site. At that point, its mineral product could have been sold to a purchaser. However, Clinchfield would not buy at the mine site and required Sterling to deliver the coal to its premises. Indeed, the incidental hammer activity was performed after Sterling had delivered the coal to its purchaser's premises and after the coal had been unloaded into the purchaser's dumping bin. The grate at the bottom of that dumping bin being stationary, it is not surprising that a few lumps of oversize coal or smaller jammed pieces of coal might become lodged in the 12-by-12-inch steel grate. However, striking those few pieces of coal with a sledge hammer or pickax to force them through the grate and into the storage bin below was merely incidental to Sterling's delivery of the coal to its purchaser. Sterling was paid for its coal on the basis of its weight as loaded on freight cars after Clinchfield's processing of the coal. Thus, as far as Sterling was concerned, the hammer activity simply forced the oversize lumps or smaller jammed lumps of coal down to where the coal would be weighed.

That reduction in size of the few oversize lumps of coal resulted from the hammer activity and was necessary for Clinchfield's subsequent treatment of the coal in its particular crusher does not make the hammer activity a treatment process as far as Sterling is concerned. As discussed above in part I, Clinchfield's subsequent treatment of the coal has no bearing upon whether Sterling's transportation of the coal is to be deemed mining. Had Sterling broken *all* of its coal into lumps of 12-inch diameter or less before loading on the trucks at the mine, rather than just breaking the bulk of it at the mine, its transportation of the coal to Clinchfield's premises would not have constituted "mining transportation" under section 613(c)(2) because Sterling would have applied no treatment process at all after the transportation. Yet, even with this scenario, the truck driver or some other Sterling employee would have had to force any jammed smaller pieces of coal through the stationary grate. Petitioners do not suggest

that merely forcing the jammed lumps through the grate constitutes the mining treatment process of breaking. The fact that a few of the lumps were larger than 12 inches does not, in our opinion, transform this incidental and minimal "hammer activity" into the mining treatment process of breaking. The same result would have followed had Clinchfield's employees performed the hammer activity after Sterling's delivery of the coal. We are unpersuaded that a different result should occur because Sterling's drivers performed the hammer activity after unloading the coal into the dumping bin. In each case, the function or primary purpose of the hammer activity was to deliver the coal and to receive payment therefor.[17]

From this record, we are unconvinced that Sterling's incidental hammer activity at its purchaser's premises was the mining treatment process of "breaking" as practiced in the coal mining industry or that it was a coal mining treatment process at all within the meaning of section 613(c)(4)(A). We therefore conclude that Sterling did not perform a mining treatment process after the transportation, with the result that its transportation of the coal is not "mining" under section 613(c)(2). Accordingly, respondent correctly determined that Sterling's costs of transporting its coal from the mine site to Clinchfield's premises must be excluded as "nonmining transportation" from its gross sales to Clinchfield in determining Sterling's gross income from mining for purposes of percentage depletion. See sec. 1.613–4(a) and (e)(2), Income Tax Regs.

---

[17]Our determination that the hammer activity does not constitute the mining treatment process of breaking is based upon all the facts and circumstances of this case. That determination satisfies us that the hammer activity at Clinchfield's Wilder #2 Dock more properly falls within the broad category of "nonmining processes" of sec. 1.613–4(g), Income Tax Regs., rather than the category of "mining processes" of sec. 1.613–4(f), Income Tax Regs. That brings this case within sec. 1.613–4(g)(3), Income Tax Regs., which provides that:

(3) *Transportation for the purpose of marketing or distribution; storage.* Transportation the primary purpose of which is marketing, distribution, or delivery for the application of only nonmining processes shall not be considered as mining. * * *

We decline petitioners' invitation to invalidate this legislative regulation. However, our determination of what constitutes a mining treatment process is not based on the primary purpose of the transportation but upon the function or primary purpose served by the hammer activity itself.

### III

Petitioner's final argument is that Sterling's transportation of the coal from the mine to Clinchfield's premises was not "transportation" at all under section 613(c)(2), but rather was "extraction" under the same paragraph. Clinchfield's processing facility was located within the property Sterling leased from Pittston. Petitioners analogize Sterling's transportation of the coal across the "bench" (the flat, previously mined area) to the transportation of coal through the tunnels or haulways of an underground mine. Petitioners conclude that just as the mineral or ore is "extracted" when it emerges at the mouth of the underground mine, likewise Sterling's coal was "extracted" when its trucks passed an imaginary line marking the point where the outcropping of the original coal deposit began or when the trucks dumped the coal at Clinchfield's plant. We cannot agree.

A contour strip-mining operation such as Sterling was conducting can be analogized to underground mining and the "bench" analogized to the haulways of an underground mine only by a willing suspension of disbelief. While the record is scant on this point, there is no suggestion that all of the hauling or even most of the hauling followed the same route back to a point analogous to the mouth of a deep mine. The record shows that the trucks hauled coal over a private road and a public road as well as over some portion of the "bench." There is no basis for determining how much of the transportation was in fact over the "bench." But apart from the factual and theoretical difficulties of petitioners' argument, petitioners have suggested no reason, and we can think of none, why any administrative practice extended to underground mining operations should be extended to their strip-mining operation.[18] The precise statutory language, which petitioners conveniently ignore, is "extraction * * * from the ground." Sec. 613(c)(2). Petitioners' analogy to underground mining distorts the meaning of this phrase beyond recognition. Under.

---

[18]Petitioners cite Rev. Rul. 73–539, 1973–2 C.B. 201, involving the mining of rock salt by the dry mining method. That ruling gives no support to petitioners' argument, addressing, as it does, specific procedure and treatment processes that are considered part of rock salt mining either as extraction or as treatment processes and whether performed underground or at the surface. We cannot read that narrow revenue ruling as applying to deep mining generally, let alone to a strip-mining operation.

any plain, ordinary meaning of this language,[19] Sterling's coal was extracted from the ground at the mine site where it was broken, cleaned, and loaded into the trucks.

Petitioners also argue that transportation within the "property" (here Sterling's leasehold) has always been considered as "extraction." Petitioners point to the initial form of the 1950 legislation that codified the treatment of certain transportation as "mining" to support their position. The original House version of the 1950 codification would have excluded from the statutory definition of mining any transportation "beyond the property,"[20] and the House characterized this position as "merely declaratory of existing law." See H. Rept. 2319, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 380, 428, 441. The provision, as ultimately enacted and now in existence, is much broader. See sec. 613(c)(2); sec. 207(a), Revenue Act of 1950, 64 Stat. 906, 931. From the House's cryptic statement regarding pre-1950 law, we cannot determine whether the House was referring to *all* transportation within the property or merely to transportation within the property to apply mining treatment processes. Given the narrow view of respondent's regulations at that time on the transportation question,[21] we rather doubt peti-

---

[19]Neither the legislative history of this statutory language nor the regulations suggest any other meaning.

[20]The definition of "the property" for purposes of natural resources taxation is now covered by sec. 614 and the regulations thereunder. In 1950, the concept of "the property" was not yet codified. The definition of "property" as "each separate interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land," sec. 614(a), is essentially an accounting concept used to separate for tax purposes the various natural resources activities of the taxpayer. See secs. 611–617. See generally *Day Mines, Inc. v. Commissioner*, 42 T.C. 337 (1964); *Island Creek Coal Co. v. Commissioner*, 30 T.C. 370 (1958); *Amherst Coal Co. v. Commissioner*, 11 T.C. 209 (1948); *Black Mountain Corp. v. Commissioner*, 5 T.C. 1117 (1945).

[21]Sec. 29.23(m)–(f), Regs. 111 (1943), provided in pertinent part:

" 'Gross income from the property' * * * means the amount for which the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine or well, but, if the product is transported or processed (other than by the processes excepted below) before sale, it means the representative market or field price (as of the date of sale) of crude mineral product of like kind and grade before such transportation or processing. If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation and the processes not listed below. The processes excepted are as follows:

"(1) In the case of coal—cleaning, breaking, sizing, and loading at the mine for shipment;"

* * * * * * *

"*In case any of the excepted processes are not applied in the immediate vicinity of the mining district in which the mine is located, costs incurred for transportation to the processing location and, if transported by taxpayer, the proportionate profits attributable to transportation should be*

tioners' view of the prior law. As with petitioners' argument in part I, their speculations about the uncertain state of the law under superseded statutes and regulations are simply insufficient to overcome the plain meaning of the present statute. By no stretch of the imagination can the language of section 613(c)(2) ("extraction of the ores or minerals from the ground") include Sterling's subsequent transportation of the coal from the pit to the plant, regardless of the route the trucks took.

Accordingly, to reflect the foregoing and respondent's concession,

*Decisions of no deficiency and no overpayment will be entered.*

---

subtracted from the sale price of the product to determine 'gross income from the property.'
   "[Emphasis supplied.]"